Docket No. 84046–Agenda 3–May 1999.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MURRAY BLUE, Appellant.

Opinion filed January 27, 2000.

JUSTICE McMORROW delivered the opinion of the court:

This matter comes before the court on the direct appeal of the jury conviction of defendant, Murray Blue, of one count of first degree murder (720 ILCS 5/9–1(a)(1) (West 1992)); three counts of attempted first degree murder (720 ILCS 5/8–4, 9–1 (West 1992)); two counts of aggravated battery with a firearm (720 ILCS 5/12–4.2(a)(1) (West 1992)); and two counts of possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(A) (West 1992)). Defendant elected to have the same jury deliberate his subsequent capital sentencing hearing. 720 ILCS 5/9–1(d) (West 1992). The jury determined that defendant was eligible for the death penalty, and that there were no mitigating factors sufficient to preclude the imposition of the death penalty. 720 ILCS 5/9–1(b), (d) (West 1998). The trial court entered judgment on the verdict and sentenced defendant to death.

Defendant appealed his convictions and sentence directly to this court. 134 Ill. 2d R. 603. On appeal, defendant contends that errors occurring at the guilt and sentencing phases of his trial entitle defendant to a new trial or, in the alternative, to a new sentencing hearing.

This court holds that cumulative errors occurring at trial deprived defendant of his due process right to a fair trial. U.S. Const., amend. XIV, §1; Ill. Const. 1970, art. I, §2. We reverse the trial court’s judgment on defendant’s convictions, vacate the sentence entered on the judgment, and remand for a new trial.

BACKGROUND

The trial of defendant Murray Blue encompassed multiple crimes. The State alleged that, on the afternoon of March 8, 1995, defendant was involved in two separate shooting incidents. Testimony of several witnesses and physical evidence admitted at the guilt phase of defendant’s trial revealed the following course of events.

A. The Victor Young Shooting

Victor Young testified that, from 1990 until 1991 or 1992, he sold cocaine and heroin for defendant at the corner of Maypole and Kildare streets in Chicago. Defendant controlled drug sales at Maypole and Kildare. At the beginning of each day, defendant would give Young two guns to carry with him. Defendant would collect the guns at the end of the day. At the time, both Young and defendant were members of the Gangster Disciples street gang. Young identified other individuals that sold drugs for defendant as Clyde Cowley and Jimmy Parker.

Young stopped selling drugs for defendant when Young joined the Conservative Vice Lords, a rival street gang. In March 1995, Young was selling drugs for the Conservative Vice Lords at the corner of Karlov and Maypole streets.

 On March 8, 1995, at approximately 2:30 p.m., Young and his friends Jermaine White and Lawrence Walker were walking on Maypole Street, between Kildare and Keeler. As they passed 4245 W. Maypole Street, defendant yelled at Young from the first-floor window of an apartment building. Defendant accused Young of talking to the police about defendant. Young denied it and told defendant that defendant was not going to harm Young. Young turned to walk away and defendant called after him. When Young turned back toward defendant, he saw that defendant was holding a “TEC-9” semiautomatic gun. Young started to run away from the apartment building and defendant began shooting at him. Young estimated that defendant fired 12 to 20 shots. Young was hit in the hip or buttocks and fell to the ground.

Lawrence Walker, who was standing next to Young at the time the shooting began, testified that he heard defendant fire at least 15 shots. Walker continued to run from the scene when the shooting started.

From the ground, Young looked behind him and saw defendant run out of the apartment building, accompanied by Clyde Cowley and Jimmy Parker. Parker was also holding a weapon and, at defendant’s direction, shot at Young as well. Young then heard defendant say, “Let’s get out of here. It’s getting too hot.”

Young saw defendant, Cowley and Parker run through a vacant lot. A few minutes later, Young observed a black Lincoln Continental automobile drive north on Kildare street at 40 miles per hour. Young could not see inside the car, but he knew that the car belonged to defendant.

B. The Shooting of Daniel Doffyn, Milan Bubalo, Murray Blue and Clyde Cowley

On the same day that the shooting of Young took place, March 8, 1995, Geneva Walker was living in an apartment in a building located at 754 N. Lorel Avenue in Chicago. The apartment building also contains the address of 750 N. Lorel, and is located approximately 17 blocks from the 4200 block of West Maypole. At 3:15 p.m., Walker heard the sound of glass breaking. Looking outside her window, she saw a man sitting on the window ledge of another first-floor apartment. She observed the man removing broken glass and dropping it on the ground. She called 911 and reported what she saw.

The 15th District station of the Chicago police department is directly across the street from 750 N. Lorel. Several police officers responded to the call of a burglary in progress at the apartment building. Officer Elois Jackson testified that she was in the warrant office at the 15th District station when she heard the report over her police radio of a burglary in progress. Jackson told the dispatcher she could respond to the call and walked across the street to 750 N. Lorel.

 As she approached the building, Jackson saw Officers Milan Bubalo and Daniel Doffyn walking to the front of the building. Jackson entered a gangway at the south side of the building, leading toward its rear. As she reached the far end of the gangway, she was approached by two black males. One carried a TEC-9 gun, with his hands extended in front of him. The other male appeared to be unarmed. Jackson keyed in her radio that she had an emergency, pointed her gun at the men, and yelled at them to get on the ground.

The man with no gun, later identified as Parker, raised his hands in the air, but did not immediately go to the ground. The other male turned and started to run away. Eventually, Parker followed Jackson’s command to get to the ground. As he did so, Jackson heard the sound of gunfire. Jackson remained behind the wall of the gangway, with her gun trained on Parker, until other officers arrived.

Officers Milan Bubalo and Daniel Doffyn were in the parking lot of the 15th District station when they learned of the suspected burglary at 750 N. Lorel. Doffyn and Bubalo went across the street together to investigate the reported burglary. The officers saw broken glass on the ground from a window next to the entrance to 750 N. Lorel. Bubalo testified that, followed by Doffyn, he went inside the building. Bubalo knocked on the front door of the apartment with the broken window. Bubalo could hear the sound of several feet running to the back of the apartment and the sound of breaking glass.

Doffyn ran down the steps from the first-floor landing and out the building. Bubalo followed Doffyn as Doffyn ran from the front of the building to the rear, through a gangway at the north side of the building. When Bubalo entered the gangway, Doffyn was already rounding the far corner of the gangway, into the back yard of the building. According to Bubalo, Doffyn never drew his service weapon at any time.

When Bubalo reached the backyard of the building, he saw Doffyn struggling with a black male. Doffyn had the individual, whom Bubalo identified in court as Clyde Cowley, in a “bear hug” and Cowley was trying to break free. Almost immediately, Bubalo heard the sound of several gunshots fired in quick succession. Both Doffyn and Cowley fell to the ground, with Doffyn lying face down on top of Cowley.

Bubalo’s testimony continued as follows: just as Doffyn and Cowley dropped, Bubalo felt himself get shot in his left hip. As he fell to the ground from his own wound, Bubalo saw defendant running toward him, from “around the corner.” Defendant was firing a gun at Bubalo and Bubalo returned fire. The officer fired until he fell on two knees and one hand. Bubalo fired a total of five shots; one struck defendant in the back of the head as defendant ran past Bubalo. This shot caused defendant to fall face forward to the ground, slightly behind Bubalo.

After defendant fell, Bubalo radioed for help, disarmed defendant, and crawled to the aid of Doffyn and Cowley. As Bubalo was attempting to reach Doffyn, Officer Robert Podkowa ran past Bubalo to help Doffyn.

After telling Podkowa what happened, Bubalo lay back on the ground. The wound in his hip prevented him from walking. Bubalo underwent surgery the next day for a total replacement of his left hip.

Several officers arrived on the scene immediately after the shooting. Officer Podkowa testified that he ran to the rear of the building from the police station after hearing the sound of gunfire. He found Bubalo on one knee, and saw three other bodies on the ground. After learning what had happened from Bubalo, Podkowa went directly to Doffyn because Doffyn appeared to be the “worst hit.” There was a lot of blood near where Doffyn lay.

Doffyn was lying on top of Cowley. Podkowa pulled Cowley out from beneath Doffyn. Because Cowley was moving, he searched Cowley to make sure Cowley had nothing in his hands. Podkowa found a loaded, .38-caliber revolver in Cowley’s right pants' pocket.

A Chicago police department detective searched defendant inside the ambulance that took defendant from 750 N. Lorel to the hospital. The detective found a nine-millimeter pistol in defendant’s right front pants' pocket and a box of nine-millimeter bullets in his other pocket.

 From the crime scene, police recovered a TEC-9 gun, a Taurus model revolver and spent cartridges. They also found a black Lincoln automobile parked “a couple of doors” south of 750 N. Lorel.

Police officers searched the first-floor apartment with the broken front window. They discovered that the window of the rear door to the apartment had also been broken. In the living room, officers found several bags of marijuana on a table, and a jacket with .38-caliber bullets in its pocket. In the bedroom, police found plastic bags containing rock cocaine and folded tin packets containing heroin. Also in the bedroom were $5,385 in cash, a scale and a razor blade. An open box of nine-millimeter cartridges lay on the bed.

Chicago fire department ambulance commander Steven Schulz stated at trial that he arrived at 750 N. Lorel at approximately 3:30 p.m. on March 8. At the rear of the building, he found four persons on the ground, including Doffyn. Doffyn was in critical condition, with a bullet wound to the head. Schulz saw “a quantity of blood ... and brain matter” in the snow. Schulz was unable to secure an airway in the unconscious Doffyn, because the officer’s jaw was clenched and Schulz could not get a laryngoscope between his teeth. Schulz established an IV and used an ambu-bag to try to hyperventilate Doffyn with oxygen.

Additionally, Schulz cut the straps of Doffyn’s shirts and bullet proof vest. Schulz saw a gunshot wound to Doffyn’s upper right chest near the clavicle. Schulz found out later that the bullet to the chest had traversed one of Doffyn’s major blood vessels. He also learned later that evening that Doffyn had died.

Reviewing a report prepared by other paramedics, Schulz averred that Cowley had been shot in the back.

The chief medical examiner of Cook County, Edmund Donoghue, performed an autopsy on Doffyn on March 9, 1995. Donoghue found evidence of a bullet wound to the right side of Doffyn’s head, a few inches above his right ear. As he opened Doffyn’s skull, Donoghue found that the bullet wound coursed through the right parietal and frontal lobes of Doffyn’s brain. Donoghue recovered a bullet and lead fragments from the right frontal lobe of the brain.

Donoghue further described an injury to Doffyn’s right upper chest. He said the gunshot wound was “very large,” involving the first rib, the space between the first and second ribs, the second rib, the right upper, middle and lower lobes of the lung, the anterior surface of the liver, the abdominal wall and the left thigh. Donoghue recovered another bullet from Doffyn’s left thigh.

Doffyn died of multiple gunshot wounds. Either of the wounds described could have killed Doffyn, according to Donoghue.

The State called Richard Chenow, formerly of the firearms section of the Chicago police department, to render expert forensic evidence. Chenow opined, 
inter alia
, that the bullet recovered from Doffyn’s thigh was fired from the TEC-9 pistol recovered from defendant. The bullet taken from Doffyn’s head was so mutilated that it contained insufficient individual characteristics to indicate, beyond a reasonable doubt, that the bullet had been also fired from the TEC-9. However, Chenow did say that the bullet came from the same class of weapons as a TEC-9.

 Chenow stated that the bullet removed from Young also came from the TEC-9 gun, “to the exclusion of all other firearms.” As to the bullet removed from Bubalo’s body, Chenow could not positively identify it as fired by the TEC-9; however, he could not rule out the TEC-9 as the source of the bullet.

The State called Etoya Nelson as a witness. She is the mother of two of defendant’s children. Nelson testified that she and defendant lived together for a period of time, ending in February 1995. Nelson spoke by telephone to defendant on March 4 and March 5, 1995. Defendant refused to tell her where he was; defendant said he was on the run from the police. Defendant called Nelson again on March 7 and came to see her.

On the witness stand, Nelson denied the substance of a statement she allegedly made to an assistant State’s Attorney on March 9, 1995. Nelson denied reporting that defendant told her, two days previously, that “people were running over him, they had taken everything he had.” However, Nelson admitted having signed the statement taken by the prosecutor on March 9.

 Defendant presented the testimony of two witnesses in defendant’s case in chief. Officer James Lukas of the office of professional standards of the Chicago police department participated in the departmental investigation that followed the shooting of Bubalo and Doffyn on March 8, 1995. Lukas testified that a recording of 911 telephone calls indicated a message was broadcast to all police at “15.28:38 hours” that “all had been captured and [
sic
] offender had been caught.” Lukas stated that a second broadcast, approximately one minute later, indicated that two officers and two others were shot, and an evidence technician was requested.

The stipulated testimony of Hernando Torres, M.D., established that on March 8, 1995, defendant received a bullet wound to the left side of his head.

Additionally, the theory of defendant’s case evolved during the course of the trial. During opening statements to the jury, counsel for defendant posited that Doffyn was not killed by bullets fired by defendant, but rather by gunfire from Bubalo’s weapon. Defendant’s attorney also implied that members of the Chicago police department discussed the shooting of Doffyn and Bubalo in an attempt to reach a consensus as to what had occurred. By the time defense counsel delivered the closing argument at the guilt/innocence phase of the trial, defendant retreated from this theory significantly, and instead argued generally that the State had failed to meet its burden of proof.

C. Defendant’s Sentencing Hearing

The same jury that deliberated the guilt/innocence phase of defendant’s trial also heard the capital sentencing phase. Regarding defendant’s eligibility for the death penalty (720 ILCS 5/9–1(b) (West 1998)), the parties stipulated that all of the evidence and signed verdict forms admitted at the guilt/innocence phase could be admitted for the purpose of determining defendant’s death eligibility.

Evidence adduced at the aggravation/mitigation phase (720 ILCS 5/9–1(d) (West 1998)) demonstrated the extent and nature of defendant’s criminal history. The State introduced the testimony of Antron Person, whom defendant had employed to sell drugs. Person stated that in 1995, defendant earned $30,000 a week selling drugs.

Person further averred that, in February 1995, Louis Moret told Person that defendant had pulled a gun on Moret and told Moret to “get away before defendant could hurt him.” Defendant put a gun to Moret’s head and told him to leave the corner of Kildare and Maypole. Also in February 1995, defendant had complained to Person that police took “stuff” from defendant, and that “the last thing he [was] going to do is kill a police [
sic
] before he let them kill him.”

A variety of law enforcement officials testified to defendant’s arrests and convictions in the years preceding March 8, 1995. In October 1991, the Chicago police arrested defendant for unlawful use of weapons after defendant attempted to pull a gun from his waistband during a protective, pat-down search by a police officer. The charge was later dismissed.

 In September 1994, defendant was arrested and charged with unlawful possession of alcohol, marijuana and weapons. Pursuant to this arrest, defendant pleaded guilty to three counts of unlawful use of weapons.

Authorities recovered two unregistered semiautomatic weapons from defendant’s residence in July 1992. During the search of his apartment, defendant told the officers where the guns were and that they were registered. The guns were not registered. Officers also found $1,740 in cash in the bedroom of the apartment. Defendant told the police that he was unemployed and could not account for the cash. Defendant was charged with mob action and failure to register handguns. The mob action charge was subsequently dismissed.

Defendant was arrested in December 1994 on charges of unlawful possession of weapons and controlled substances. As a result of the arrest, police recovered a loaded, .38-caliber handgun, $1,250 in cash, heroin, and 150 bags of rock cocaine.

A joint project by the Chicago police department and the United States Bureau of Alcohol, Tobacco and Firearms (ATF), conducted in July 1993, investigated how handguns were coming into the City of Chicago. According to ATF agent John Taylor, the ATF and Chicago police learned that a man named Barry Jones was a “straw purchaser” of guns for defendant. Taylor testified that Jones was forced to purchase guns for defendant to repay a $1,500 debt Jones owed to defendant. Defendant had also ordered gang members to beat up Jones because of his failure to repay the debt, Taylor said.

Taylor stated that when defendant wanted Jones to make a purchase, defendant would pick up Jones in defendant’s car and drive to a gun shop. Defendant would give Jones money and a list of guns that defendant wanted Jones to buy. Once purchased, Jones would turn the guns over to defendant. Jones allegedly purchased 28 guns for defendant.

The State introduced additional evidence concerning defendant’s purported involvement in a shooting that occurred shortly before March 8, 1995. Terrence Hall testified that on February 26, 1995, he was working as the manager of an Amoco filling station at Washington and Pulaski. At approximately 10 p.m., Hall saw a gray customized van pull into the station and begin to refuel. A car pulled into the other side of the station. The driver of the car, later identified as Louis Moret, approached the driver of the van and spoke to him. Then Moret walked to a line at the cashier station. Two men emerged from the van and approached Moret. One of the men from the van, subsequently identified as defendant, seemed very angry and pulled a gun from his pocket. Moret began to run and defendant fired several shots at Moret, killing him. Hall stated that defendant followed Moret as Moret tried to run from defendant. Both defendant and the second person from the van then walked to the van and drove away.

 Detective Gerhardstein of the Chicago police department investigated Moret’s murder. He counted 14 bullet wounds on Moret’s body, including one wound in the middle of Moret’s forehead, and wounds to Moret’s neck, chest and back. Gerhardstein said that witnesses at the station identified the shooter as defendant. Gerhardstein obtained an arrest warrant for defendant on March 4, 1995; he arrested defendant for Moret’s murder on March 8, 1995.

In mitigation, defendant introduced the testimony of acquaintances, family members and medical experts. Jacqueline Wheeler, a teacher at the Austin Community Academy High School between 1979 and 1992, testified that she selected defendant to participate in the “principal scholars program.” The program is designed for minority students who show academic promise.

Defendant’s grade point average in high school was 2.6, which was considered “the cream of the crop” at that Austin Community Academy. To her knowledge, defendant had no disciplinary problems while in high school.

Family members averred that defendant visited his children on a regular basis and participated in their upbringing. Testimony from the mother of two of defendant’s children, and defendant’s eight-year-old daughter indicated that defendant’s children would miss him if he were put to death. Defendant has five children by four different women.

Defendant’s brothers, Robert Lee Blue and Curtis Blue, testified that defendant came from a family of 13 children. It was a single-parent family. Robert and Curtis described defendant as a very good student in high school and a very good employee, when defendant was working at Church’s Chicken.

Defendant’s brothers professed not to know about defendant’s alleged history as a drug dealer. In addition, Robert admitted that he did not know what defendant was doing for employment in 1995, because Robert was away at school. He did not know why guns and drugs were found in an apartment where defendant was living in 1995. Defendant encouraged Robert not to get involved with drugs or gangs.

Both Robert and Curtis knew defendant was accused of killing Doffyn, but neither had spoken to defendant about the murder of Louis Moret.

Curtis testified that, as a result of the bullet wound to the head that defendant received on March 8, 1995, defendant is not as “agile” as he used to be and defendant has dizzy spells. Sometimes he passes out as a result of the wound.

Defendant’s maternal aunt, Gertrude Collier, also testified. According to Collier, when defendant was growing up, he was a lovable and respectable young man. He won trophies and praise from teachers. She loves him very much and if he was taken out of her life, it would “destroy her very much.”

Defendant’s mother, Carrie Blue, testified that defendant was the eleventh-born of her 13 children. She said that defendant was a “nice son” and that she never had any problems with him. He was an “A” student as a child. She described an incident in which defendant suffered a severe football injury in high school that caused defendant to lose a kidney. Even though this accident necessitated a prolonged absence from school, defendant maintained good grades, his mother said.

Carrie Blue testified that defendant loves his children and does things for them and with them. He supports his children.

She pleaded with the jury not to take her son away from her.

Defendant’s mother admitted that, before she moved out of an apartment she occupied at 4306 W. Maypole Street in 1991, she was aware that drugs were being sold at the corner of Maypole and Kildare. After she was shown several guns on cross-examination, she asserted that she did not know how the guns got into her home on Maypole Street or how defendant had obtained them. None of her children would allow her to see them with guns because they know that she would not approve. She never saw cocaine or heroin in her son’s home.

Carrie Blue did not know if defendant had been fired from Church’s Chicken. She said that in 1994 and 1995, defendant was working for her. She has never asked defendant about any murder.

Chaplain Marcus Baird is the chaplain at the Cook County jail. He testified to defendant’s participation in various prayer services and Bible studies. Baird said defendant was one of the “disciples in counseling.” He has seen defendant develop a desire to help others and to get more involved in the Bible studies program at the jail. Baird agreed that by participating in religious programs, defendant could call Baird as a witness to testify that defendant was active in those programs.

Baird said that he has talked to defendant about this case and that defendant sometimes struggles to remember things. When he talks to defendant, defendant sometimes understands the questions that Baird asks and is sometimes able to speak about Jesus and God. Defendant has told Baird that he shot a police officer, although he cannot remember the shooting. Defendant has not mentioned shooting another officer or the shooting of Louis Moret.

Jamillah Simms, the mother of defendant’s son, and defendant’s friend Robert McMillan also testified on defendant’s behalf. Their testimony was substantially similar to the mitigation testimony of other family members and acquaintances.

A board-certified neurologist, Gero Kragh, M.D., testified for the defense. In Kragh’s opinion, defendant has static encephalopathy and subclinical polysensory neuropathy, etiology to be defined. A review of a CT scan taken of defendant on March 9, 1995, showed that defendant had bone and bullet fragments in his brain and neck. Physical findings in defendant suggest significant and profound diffused difficulties involving the brain, including the left temporal lobe, left cerebellar hemisphere, brain stem, eighth cranial nerve and other ancillary problems in the neck.

Kragh concluded that defendant does not have a normal brain. Defendant has permanent brain damage, although not all of his current difficulties can be attributed to the bullet fired by Bubalo. Defendant’s school records suggest that he suffered from an attention deficit disorder and hyperactivity. Kragh believed that defendant’s disinhibition or potential for explosiveness also predates the gunshot wound to the head. The same applies to other problems exhibited by defendant, including difficulty in organizing his thoughts in a coherent fashion and “difficulty with the conversation in the brain between the left and right halves at various times.”

Kragh attributed other difficulties to damage caused by the bullet wound. He said defendant could not use complete sentences to describe the shooting at 750 N. Lorel. The best defendant could recall was the agitation, confusion, and explosiveness of the moment. He had no recall of events 30 minutes before the shooting and events one month after the shooting. He also said defendant has difficulty with immediate recall, getting his thoughts together, balance, clumsiness, “the staggers” and “things like that.”

 Further, defendant exhibits abnormal reflexes, which indicate a problem with his left frontal lobe. Due to this physical defect, defendant will behave unpredictably when stressed or will predictably not behave in a manner that is conducive for his survival or the survival of others. Even under the most quiet circumstances, defendant is not, and never will be, normal. While he has made remarkable progress since he was shot in the head, it is doubtful that the progress will continue.

The defense also called Michael Gelbort, Ph.D., a clinical psychologist with a specialty in neurophsychology. Gelbort found cognitive dysfunction in defendant correlating to defendant’s brain damage. Some of the difficulties resulting from the damage to the left hemisphere of defendant’s brain are: difficulties in learning new information; intellectual scores in the borderline mentally deficient range; changes in sense of touch; change in motor functioning. Gelbort opined that defendant’s neurocognitive deficits are permanent and irreversible. Gelbort recommended that defendant be placed in a structured, controlled environment where he would have to make few choices and where he could avoid stress.

In rebuttal, and over defendant’s objection, the State introduced the victim impact statements of Doffyn’s parents and daughter. Doffyn’s mother read all three statements into the record.

The court allowed the State to present the testimony of Mathew Markos, M.D., in rebuttal, again over the objection of defendant. Markos is a forensic psychiatrist. Markos examined defendant in late 1996 and early 1997 in order to determine defendant’s fitness to stand trial and defendant’s mental state on March 8, 1995.

Markos concluded that, while defendant does have some brain impairment, defendant did not suffer from any impairment significant enough to render defendant unfit to stand trial. Markos found defendant to be calm, cooperative, and alert. Defendant responded to Markos’ questions in a relevant, coherent and rational manner. Markos found no indication of anxiety, agitation or abnormal behavior. He found no evidence of abnormal thought processes, delusional thinking, or abnormal perceptions.

Defendant has a memory deficit, which includes an absence of memory of the events surrounding his arrest on March 8, 1995. Aside from this “isolated cognitive deficit,” defendant appears to have no other cognitive deficits. Defendant is intact cognitively and mentally, except for the memory deficit.

Defendant scored 84 on an IQ test. Someone with this score is in the “borderline to normal” range of intelligence. If he scored an 85, defendant would fall in the “normal” range.

Defendant has shown good mental and physical improvement since the injury, Markos testified. Markos did not detect any malingering in defendant.

ANALYSIS

Before this court, defendant alleges that he is entitled to either a new trial and sentencing hearing, or a new sentencing hearing, alone. In particular, defendant maintains that the conduct of the State’s prosecutors throughout the entire proceedings below was so improper and abusive that defendant was denied a fair trial. Next, defendant asserts that, during the guilt phase of the trial, the trial court committed the following errors: refusing to ask potential jurors if they would automatically sentence defendant to death for killing a police officer; permitting the State to display a life-size mannequin clothed with Doffyn’s uniform and allowing the exhibit to go to the jury room during the jury’s deliberations; allowing the State to argue that the Doffyn family and the police “needed to hear” from the jury; and sustaining hearsay objections by the State during defense counsel’s examination of a witness, where the State had elicited hearsay from the same witness on direct examination.

 Defendant further contends that, during the sentencing phase of his trial, the trial court erred in the following respects: denying defendant’s request that a member of the public defender’s office assist defendant’s counsel; permitting Dr. Markos to testify regarding the extent of brain damage suffered by defendant when he was shot by Bubalo; allowing the State to display a five-foot-square poster illustrating various aspects of defendant’s criminal history; and admitting victim impact testimony that contained improper content and exceeded the permissible amount of such testimony allowed by statute. Lastly, defendant urges the court to find the death penalty statute unconstitutional.

Following a thorough review of the record and controlling case law, we hold that some of the arguments raised by defendant constitute error and, cumulatively, deprived defendant of his due process right to a fair trial. We find that a combination of errors occurring at trial may have coerced the jury into returning a verdict more likely grounded in sympathy than on a dispassionate evaluation of the facts. In light of this possibility, the constitutionality of defendant’s trial is in doubt and we must reverse and remand for a new trial.

A. Doffyn’s Uniform

Defendant alleges that the trial court abused its discretion by admitting the bloodied and brain-splattered uniform of Daniel Doffyn into evidence and permitting the uniform to be taken into the jury room during deliberations. At trial, defendant moved the trial court to bar introduction of Doffyn’s partial uniform into evidence. The uniform, consisting of Doffyn’s shirts, police jacket and bullet-proof vest, contained bloodstains and stains from Doffyn’s brain matter. Also, the clothing was torn as a result of medical treatment rendered to Doffyn. Defendant argued that autopsy reports, photographs taken of Doffyn at the morgue, and the testimony of the medical examiner adequately supplied any facts the State intended to prove by display of the uniform. Defendant asserted that viewing the uniform would have no probative value, and it could only “excite” the jury’s emotions concerning the shooting of a police officer.

 In response, the State urged that the uniform showed that defendant knew Doffyn was a police officer when defendant fired his weapon at him and that the officers, Doffyn and Bubalo, were wounded in the line of duty. The clothing display would also corroborate the medical examiner’s testimony concerning the placement and nature of Doffyn’s injuries, according to the State. The trial court denied defendant’s motion, finding the uniform “relevant.”

The State displayed the uniform on a headless, torso mannequin during the State’s case in chief. The State introduced the uniform during Bubalo’s testimony, but had the mannequin in the court room, in view of the jury, during the examination of another State witness. Defendant objected to the premature display of the uniform and to the fact that the State placed the clothes on a life-size mannequin. The trial court ordered the mannequin removed to the court’s chambers until it was ready to be introduced.

After the completion of Bubalo’s testimony, the mannequin remained in the courtroom. Counsel for defendant again objected, complaining that the mannequin had been present during the testimony of several witnesses. The court again ordered it removed from the courtroom.

 Defendant renewed his objection to the exhibit when the State moved to admit the exhibit into evidence, and when the State proposed sending the exhibit to the jury room during deliberations. The trial court overruled defendant’s objections and, prior to jury deliberations, ordered that the jurors be supplied with rubber gloves in case the jurors wanted to handle the uniform.

The fundamental principles governing the admission of physical evidence are well established:

“Evidence having a natural tendency to establish the facts in controversy should be admitted. A party cannot have competent evidence excluded merely because it might arouse feelings of horror and indignation in the jury. Any testimony concerning the details of a murder or other violent crime may have such tendencies, but manifestly this could not suffice to render it incompetent. Of course, where spectacular exhibits having little probative value are offered for the principal purpose of arousing prejudicial emotions they should be promptly excluded. But questions relating to the *** manner and extent of its presentation, are largely within the discretion of the trial judge, and the exercise of that discretion will not be interfered with unless there has been an abuse to the prejudice of the defendant.” 
People v. Jenko
, 410 Ill. 478, 482 (1951).

Further, if a defendant in a murder trial pleads not guilty, the State must prove every element of the crime charged and every fact relevant to the charges, irrespective of whether defendant offers to stipulate to any of those facts. 
People v. Henderson
, 142 Ill. 2d 258, 319 (1990); 
People v. Dukett
, 56 Ill. 2d 432, 447 (1974).

 While the State and defendant rely on case law regarding photographic evidence to further their respective arguments, a line of cases already exists concerning the admission of articles of clothing worn by a victim. The common principles guiding these decisions echo the holding in 
Jenko
, namely, that clothes will be admissible provided they tend to prove facts material to the issues to be proved in the case, and the probative value of the evidence is not outweighed by potential prejudice. 
People v.
 
Dukett
, 56 Ill. 2d 432, 447-48 (1974); see also 
People v. Pittman
, 55 Ill. 2d 39, 60 (1973); 
People v. Jurczak
, 147 Ill. App. 3d 206, 215 (2d Dist. 1986); 
People v. Parisie
, 5 Ill. App. 3d 1009, 1039 (4th Dist.1972). The admission of the articles rests within the trial court’s discretion. See 
Dukett
, 56 Ill. 2d at 447-48; 
People v. Pittman
, 55 Ill. 2d at 60.

Illinois courts have found bloodstained police uniforms both inadmissable and admissible. In 
People v. Burrell
, 228 Ill. App. 3d 133 (1992), the trial court admitted two police officers’ “bullet-marked and bloodstained uniforms” into evidence and allowed the uniforms to go the jury room during deliberations. On appeal, defendants maintained that the uniforms were irrelevant to contested issues at trial, and that, as police uniforms, they were “symbols charged with emotion.” 
Burrell
, 228 Ill. App. 3d at 143-44. The State responded that the bullet holes in the uniforms were relevant to the question of defendants’ intent to kill the officers and to show that the defendants meant to inflict great bodily harm.

The 
Burrell 
court noted that tangible objects admitted into evidence that are probative of any material issue may be taken into the jury room during jury deliberations. 
Burrell
, 228 Ill. App. 3d at 144. Whenever physical evidence is allowed into the jury room, the proximity of the exhibit to the jury and the potential that the exhibit may be in the jury’s possession for an extended period of time give the proponent of the exhibit a distinct advantage over the opposing party. 
Burrell
, 228 Ill. App. 3d at 144. For this reason, the court will closely scrutinize the exhibit to ensure that its prejudicial value does not outweigh its value as evidence. 
Burrell
, 228 Ill. App. 3d at 144.

 The appellate court ruled that, while the uniforms were probative of defendants’ criminal intent, the prejudicial effect of the uniforms outweighed their probative value. “The jury saw the shirt, bullet holes, and blood during the trial. [One of the victims] even put his fingers through the bullet holes during his testimony.” 
Burrell
, 228 Ill. App. 3d at 144. Thus the court determined that the trial court erred in allowing the uniforms into evidence, although the error was subsequently determined to be harmless error.
 Burrell
, 228 Ill. App. 3d at 144.

In contrast to 
Burrell
, the appellate court in 
People v. Stewart
, 122 Ill. App. 3d 546, 549 (1984), found no error in the admission of a policeman’s uniform. In 
Stewart
, the trial court admitted the officer’s “bloody clothing” into evidence. The State successfully argued that the uniform was proof of aggravated battery, the crime charged against defendant. 
Stewart
, 122 Ill. App. 3d at 549. The appellate court affirmed because the evidence was relevant to the crime charged. 
Stewart
, 122 Ill. App. 3d at 549.

Neither appellate decision controls the outcome of this case. 
Anderson v. Board of Education of School District No. 91
, 390 Ill. 412, 420 (1945). However, we find the reasoning of the 
Burrell 
court persuasive in the context of the instant appeal. Like the uniform in 
Burrell
, the verbal descriptions and photos of Doffyn’s uniform in the record indicate that the uniform displayed to the jury was “bullet-marked and bloodstained.” 
Burrell
, 228 Ill. App. 3d at 143-44. The uniform also bore the tears from where paramedics and other medical personnel attempted to save Doffyn’s life.

 There was no question left in the jury’s mind, moreover, as to the nature of the stains on the front and collar of the shirt and on the jacket. During his direct examination, Bubalo identified the uniform on the mannequin as Doffyn’s police uniform, and then answered the following question:

“Q. There’s a great deal of damage to the front of this due to rescue measures.

Is this the blood and brain matter on the shirt, is this how it appeared to you when you saw him on March 8th of 1995?

A. Yes, sir.”

The reasons offered by the State to the trial court for admission of the uniform included corroboration of anticipated medical testimony regarding the path of the bullets that injured Doffyn, as well as reinforcement of allegations that Cowley and defendant knew that they were firing their guns at uniformed officers, acting in the line of duty. On appeal, the State argues that the uniform shows defendant intended to kill Doffyn by purposefully firing at Doffyn’s head and above his bullet proof vest.

Not all of these reasons withstand close scrutiny. According to the indictments returned in this case, the fact that the victims were police officers was relevant to the charge that defendant attempted to murder Bubalo (but see 720 ILCS 5/8–4, 9–1(a) (West 1992)), but none of the first degree murder charges for the death of Doffyn were dependant on the victim’s profession (720 ILCS 5/9–1(a)(1) (West 1992)). Further, as defendant argues before this court, if the State wanted to illustrate the defendant’s intent to shoot at Doffyn’s head, it makes no sense to employ a model on which the head is absent. Additionally, there was ample testimony, from paramedic Schulz and Dr. Donoghue, to describe the placement and appearance of Doffyn’s wounds. Through Donoghue, moreover, the State introduced and admitted 16 autopsy photographs documenting Doffyn’s injuries. Therefore, although we agree that the uniform could corroborate the medical testimony describing the placement or nature of one of the fatal wounds on Doffyn’s body, the evidentiary value of the uniformed mannequin–over and above the other proof introduced by the State–was minimal.

Having found the uniform at least nominally probative of a material fact, we now determine whether the potential prejudice of the uniform outweighed its probative value. We conclude that it did. While we are aware that pictures graphically displaying wounds and autopsy procedures have been previously allowed into evidence (see, 
e.g
., 
People v. Brown
, 172 Ill. 2d 1, 40-41 (1996); 
People v. Jones
, 156 Ill. 2d 225, 246 (1993); 
Henderson
, 142 Ill. 2d at 320), the physical evidence here was not photos of a gruesome scene, but the actual remnants of the scene itself, spattered with the actual blood and brains of the victim.

We are further aware that bloodied garments of victims have been admitted into evidence, as the cases cited above demonstrate. In this case, however, we perceive a coalescence of facts that tip the evidentiary scale from items that are merely useful to those that are aimed directly at the sympathies, or outrage, of the jury. These are not just bloody clothes, but the clothes of a police officer, which, as the defendants noted in 
Burrell
, 228 Ill. App. 3d at 144, are uniquely “charged with emotion.” Critically, too, the jury knew that the stains on the uniform were not only from the officer’s blood–a concept disturbing in and of itself–but also from the officer’s brains. The latter fact presumably intensified the already inflammatory nature of the garments.

 Additionally, the jury was allowed an extended period of exposure to the life-size mannequin that wore the uniform. They saw the mannequin in the courtroom during the testimony of several witnesses, and then were allowed an even closer exposure to the exhibit during their deliberations. By furnishing the jurors with gloves, moreover, the trial court appeared to encourage the jury to engage in a tactile interaction with the uniform.

The nature and presentation of the uniform rendered the exhibit so disturbing that its prejudicial impact outweighed its probative value. Its admission into evidence was error.

B. The State’s Rebuttal Closing Argument

Defendant contends next that the trial court abused its discretion by allowing the State, in rebuttal closing argument, to make inappropriate references to police and to Doffyn’s family. Rather than arguing the evidence and inferences to be drawn therefrom, defendant maintains, the State appealed directly to the jurors’ passions and prejudices by urging the jury to use its verdict to send a message to Doffyn’s family and to the police. Defendant maintains that the error inherent in the State’s improper argument deprived defendant of his due process right to a fair trial.

The State’s response is twofold. First, the State asserts that defendant waived this argument by neglecting to contemporaneously object to the statements and to raise the alleged error in defendant’s post-trial motion. See 
People v. Enoch
, 122 Ill. 2d 176, 186 (1988). Second, the State avers that the argument fell squarely within the broad latitude allowed prosecutors in making arguments, and to trial judges in scrutinizing their admissibility. 
People v. Buss
, 187 Ill. 2d 144, 244 (1999).

The State correctly observes that defendant failed to properly preserve this argument for our review. 
Defendant contemporaneously objected to the State’s references to police officers, but failed to raise the issue in his post-trial motion. As to the argument concerning Doffyn’s family, defendant neither objected at trial nor included the alleged error in his motion for a new trial. Generally, in the absence of both a timely objection at trial, and repetition of that objection in a post-trial motion, any alleged error is deemed waived. 
Enoch
, 122 Ill. 2d at 190. Under the unique circumstances of this case, however, we decline to apply the waiver doctrine so that we may address the merits of defendant’s arguments and protect defendant’s interest in receiving a fair trial. 
People v. Kliner
, 185 Ill. 2d 81, 127 (1998) (waiver doctrine is a limitation on the parties, not the court); see also 
People v. Terrell
, 185 Ill. 2d 467, 528 (1998) (Freeman, C.J. specially concurring, joined by McMorrow, J.).

Courts allow prosecutors great latitude in making closing arguments. 
People v. Cisewski
, 118 Ill. 2d 163, 175 (1987). In closing, the State may comment on the evidence and all inferences reasonably yielded by the evidence. 
People v. Pasch
, 152 Ill. 2d 133, 184 (1992). However, argument that serves no purpose but to inflame the jury constitutes error. 
People v. Tiller
, 94 Ill. 2d 303, 321 (1982); 
People v. Threadgill
, 166 Ill. App. 3d 643, 651 (1988). Closing arguments must be viewed in their entirety and the allegedly erroneous argument must be viewed contextually. 
Cisewski
, 118 Ill. 2d at 176. “The regulation of the substance and style of the closing argument is within the trial court’s discretion, and the trial court’s determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion.” 
People v. Byron
, 164 Ill. 2d 279, 295 (1995); accord 
Cisewski
, 118 Ill. 2d at 175; 
Pasch
, 152 Ill. 2d at 185.

In its rebuttal argument, the State argued:

“MR. McKAY [Assistant State’s Attorney]: You heard from Roger Doffyn. He needs to hear something from you. He and Mrs. Doffyn need to hear from you that even though they suffered the worst possible nightmare a parent could suffer, that they had to bury their child, they need to hear from you that they will get justice. Brittany Doffyn needs to hear from you that daddy didn’t die in vain. Mike Bubalo needs to hear it from you, artificial hip and all[,] that his heroics, his courage, his honor, and his duty didn’t go in vain. Every Chicago police officer–

MS. HILL -McCLAIN [defense counsel]: Objection to that, Your Honor.

THE COURT: Overruled.

MR. McKAY: From the superintendent down to the newest rookie and every police officer in this state needs to hear from you right now.

MS. CAROTHERS [defense counsel]: Your Honor, that is objectionable.

THE COURT: Overruled.

MR. McKAY: That while they serve and protect us we will serve and protect them. They need to hear from you that no gun-toting drug dealer is going to get away with shooting one of them.”

The State defends these appeals to the jury on behalf of the Doffyn family and the police as supplications to fearlessly administer justice. Generally, arguments urging a fearless administration of justice or commenting unfavorably on the evils of crime do not constitute error. 
People v. Hope
, 116 Ill. 2d 265, 277-78 (1986). However, even a cursory examination of the State’s argument in this case suggests more than a general exhortation to the jury to protect society. Accordingly, we examine separately the remarks made concerning the victim’s family and the police in order to determine the existence, if any, of error.

1. The Doffyn Family

In 
People v. Bernette
, 30 Ill. 2d 359 (1964), this court ruled that a defendant’s guilt may be proved only by “legal and competent” facts, “uninfluenced by bias or prejudice raised by irrelevant evidence.” 
Bernette
, 30 Ill. 2d at 371. Proof that the victim of a crime is survived by a family is irrelevant to the guilt or innocence of a criminal defendant. 
Bernette
, 30 Ill. 2d at 371. It can only serve to prejudice a defendant in the eyes of the jury. 
Bernette
, 30 Ill. 2d at 371. Therefore, the court continued, evidence or argument dwelling on the victim’s family, or relating defendant’s punishment to the existence of a family, is “inflammatory and improper” and constitutes reversible error. 
Bernette
, 30 Ill. 2d at 371.

In 
People v. Hope
, 116 Ill. 2d 265 (1986), the State made several references to and elicited testimony concerning the victim’s family. The victim’s spouse testified that she had three children, 10 years of age and younger, and that two of the children were fathered by decedent. She also identified family photographs of the decedent with her and the children. At closing argument, the State referred to decedent’s family, saying, “ ‘Little did [decedent] know that when he said good-bye to his wife, that would be the last time he saw her alive.’ ” 
Hope
, 116 Ill. 2d at 277.

 The 
Hope
 court found that the evidence and argument about the victim’s family bore no relation to defendant’s innocence or guilt. 
Hope
, 116 Ill. 2d at 278. The sole motivation behind these statements was a desire to prejudice the jurors against the defendant, and to inflame their emotions. 
Hope
, 116 Ill. 2d at 278. In reversing and remanding for a new trial, the court held that “ ‘be he a sinner or a saint, [defendant] has the right to expect that his fate will be fixed with reference only to the circumstances of the crime with which he is charged.’ ” 
Hope
, 116 Ill. 2d at 278, quoting 
People
 
v
. 
Gregory
, 22 Ill. 2d 601, 606 (1961). See also
 People v. Henderson
, 142 Ill. 2d 258, 322 (1990) (argument that defendant’s acts deprived victim of her “rights” held to be improper); 
People v. Bartall
, 98 Ill. 2d 294, 322-23 (1983) (the State’s urging to the jury to “ ‘tell the [victim’s family] what you decided’ ” was “improper, inexcusable and unprofessional”); 
People v. Jordan
, 38 Ill. 2d 83, 90-92 (1967) (error for prosecutor to elicit testimony concerning victim’s children and to argue that victim was as beloved as any celebrity in the country); 
People v. Gregory
, 22 Ill. 2d 601, 605-06 (1961) (argument concerning decedent’s wife and small children partially deprived defendant of a fair trial).

In the present appeal, the State’s argument that Doffyn’s father, mother and child needed to “hear” from the jury was patently immaterial to the defendant’s guilt or innocence. Combined with the State’s reminder of the pain endured by the parents in the loss of their only child, the remarks concerning the decedent’s family amounted to an unequivocal, and erroneous, appeal to the jury’s emotions.

Additionally, the inflammatory impact of the State’s argument cannot be fully understood without also knowing the evidence that preceded it. 
Kliner
, 185 Ill. 2d at 157; 
People v. Leger
, 149 Ill. 2d 355, 392-93 (1992); 
People v. Baptist
, 76 Ill. 2d 19, 29 (1979); 
People v. Tate
, 45 Ill. 2d 540, 545 (1970); see 
People v. Parks
, 168 Ill. App. 3d 978, 982-83 (1988). The State opened its case in chief with testimony from decedent’s father, Roger Doffyn. Mr. Doffyn’s testimony covers nine pages of transcript. Among other things, he testified as to his age (71), and that he had been married to decedent’s mother for 51 years. Mr. Doffyn related that he and his wife occupied one floor of a two-flat, while his son and his granddaughter lived together on another floor of the same building. According to Mr. Doffyn, his son and granddaughter shared the same birthday.

 Mr. Doffyn described the last time he saw his son alive, March 8, 1995. He identified a photograph of his son and described the events of the evening of March 8, after he learned that his son had been shot.

Some of the testimony admitted through Mr. Doffyn served the proper purpose of identifying the victim as Daniel Doffyn, and proving that he was alive, and subsequently died, on the date of defendant’s crime. 
People v. Easley
, 148 Ill. 2d 281, 335 (1992). Further, we agree that incidental evidence of a victim’s family is not only permissible, but in most trials, unavoidable, since “[c]ommon sense tells us that murder victims do not live in a vacuum and that, in most cases, they leave behind family members.” 
People v. Free
, 94 Ill. 2d 378, 415 (1983).

Nonetheless, some of the evidence admitted through Mr. Doffyn, such as the age of his granddaughter, the number of years he has been married to decedent’s mother, and the living arrangements of the Doffyn family, was not probative of defendant’s guilt or innocence. This evidence served only one purpose, namely, to highlight the poignancy of the Doffyn family’s loss and to suggest to the jury that the family’s pain could be alleviated by a guilty verdict. Moreover, the knowledge of these facts surely heightened the impact of the State’s emotional closing argument on the jury.

We reject the State’s contention that jury instructions in the present matter cured any error introduced by the State’s argument. The instructions cited by the State were standard instructions that argument of counsel are not evidence. Illinois Pattern Jury Instructions, Criminal, No. 1.03 (3d ed. 1992). Instructing the jury that arguments are not evidence will not, in every instance, cure the defect caused by introduction of such evidence. Whether the remarks and/or evidence constitute error depends, in each case, on the nature and extent of the statements and whether they are probative of defendant’s guilt. See 
People v. Hayes
, 139 Ill. 2d 89, 142 (1990); 
Hope
, 116 Ill. 2d at 276.

 In the case at bar, we find that the generic instructions tendered by the State were not likely to undo the damage to defendant’s case inflicted by the State’s pointed remarks. Therefore, we conclude that the trial court abused its discretion by permitting the State to argue that its verdict should be a vehicle to vindicate the Doffyn family. 
Cf.
 
People v. Peeples
, 155 Ill. 2d 422, 481-82 (1993) (any error resulting from “general” and “fleeting” remarks concerning the victim’s family, and reference to the defendant as a “predator” cured by standard instructions concerning arguments of counsel); 
People v. Chavez
, 265 Ill. App. 3d 451, 461-62 (1994).

2. The Police

Similarly, we determine that the trial court abused its discretion in failing to sustain defendant’s objections to the State’s argument concerning the police. The State’s exhortation that the jury send a message to all police that the jury supported them, from the “superintendent to the newest rookie,” was little more than a transparent play to the jury’s sympathy and loyalty to law enforcement. Nothing in the portions of the State’s argument quoted above tended to make the fact of defendant’s guilt more or less true.

 The same reasons that made introduction of the remarks concerning the Doffyn family inappropriate should have compelled the trial court to bar the State’s direction that the jurors use their verdict to reassure the police. Admission of these remarks constituted an abuse of the trial court’s discretion. 
Cf.
 
People v. Clark
, 52 Ill. 2d 374, 390 (1972); 
People v. Montgomery
, 254 Ill. App. 3d 782, 795 (1993); 
People v. Rivera
, 235 Ill. App. 3d 536, 540-41 (1992);
 People v. Williams
, 228 Ill. App. 3d 981, 1002 (1992); 
People v. Threadgill
, 166 Ill. App. 3d 643, 648-51 (1988); 
People v. Plair
, 51 Ill. App. 3d 75, 81 (1977); but see 
People v. Chavez
, 265 Ill. App. 3d at 461
; 
People v. Lovelace
, 251 Ill. App. 3d 607, 623-24 (1993); 
People v. Jenkins
, 190 Ill. App. 3d 115, 136 (1989).

Our own review of the record leads us to believe that the State compounded the error of its rebuttal argument by introducing, in the State’s case in chief, testimony from Commander Joseph Delopez of the Chicago police department. Delopez testified that, in November 1994, he was the commander of the training division of the department. He was present for the “star ceremony” when Doffyn took his police officer’s oath of office.

Over defendant’s objection, the court permitted Delopez to read aloud the oath of office sworn by Doffyn. The oath states:

“I, Daniel Doffyn, having been appointed to the office of police officer, do solemnly swear that I will support the constitution of the United States and the constitution of the State of Illinois, and that I will faithfully discharge the duties of the office of such to the best of my abilities.”

 Delopez was also permitted to testify that Doffyn’s police badge was retired and is now displayed in the “honored star case” at Chicago police department headquarters.

At the time Delopez testified, the State argued that his testimony was relevant to show that Doffyn was killed in the line of duty. Defendant did not dispute this fact at trial. Moreover, the fact Doffyn was killed in the line of duty was relevant only at the eligibility phase of defendant’s subsequent capital sentencing hearing (720 ILCS 5/9–1(b)(1) (West 1992)). The fact that Doffyn was a police officer was, at the guilt phase of the trial, irrelevant to the central issue of defendant’s guilt or innocence. 720 ILCS 5/9–1(a) (West 1992).

In sum, the trial court allowed the State to argue two emotion-laden themes to the jury, neither of which were probative of defendant’s guilt for the several crimes charged against him. The nakedly prejudicial nature of the arguments was intensified by parallel evidence which, perhaps by design, reinforced the tragedy of the loss suffered in this case by the police force and by the family of Daniel Doffyn. Consequently, we hold that the trial court abused its discretion by permitting the jury to hear these arguments.

C. “Testifying” by Prosecutors

Defendant enumerates several instances of alleged misconduct at trial by attorneys for the State. Defendant contends that the State’s improper examination and treatment of certain witnesses and abusive conduct toward defense counsel deprived defendant of a fair trial.

This court finds that counsel for the State engaged in improper conduct at trial. Additionally, the most egregious behavior contributed to the continuum of error that deprived defendant of a fair trial.

 In the State’s case in chief, the State called Etoya Nelson to establish,
 inter alia
, defendant’s purported hostility toward police and the fact that, in the days immediately preceding March 8, 1995, defendant believed that the police were pursuing him. Before trial, Assistant State’s Attorneys McKay and O’Connor interviewed Nelson after a warrant had issued for her arrest. McKay and O’Connor were also the prosecutors that tried the State’s case against defendant.

The trial transcripts demonstrate that the exchanges at trial between Nelson and the prosecuting attorneys were palpably hostile. Further, the State’s counsel repeatedly interjected testimony of their own through thinly veiled “objections.” The following colloquy illustrates the State’s misconduct during cross-examination of Nelson by defendant’s attorney:

“MS. HILL-McCLAIN [defense counsel]: And what about Mr. O’Connor?

MS. NELSON: He did have an attitude problem. When I first told him that my daughter was sick, he told me my daughter was not his concern. She was at home very sickly on [
sic
] asthma.

MR. O’CONNOR: Judge, objection. That’s a lie.

THE COURT: I’ll sustain the objection.

MS. HILL-McCLAIN: Can we have Mr. O’Connor’s statement read back?

MR. O’CONNOR: I said it was a lie.

MS. HILL-McCLAIN: Object to him saying that’s a lie, Your Honor, unless he’s going to swear under oath and take the stand.

THE COURT: I’ll sustain the objection.”

During redirect examination, Assistant State’s Attorney McKay questioned Nelson concerning their encounter before trial:

“MR. McKAY: How was that?

NELSON: And you told me, that’s why you are going to jail now. You told me that.

MR. McKAY: You keep going. I want you to tell me, what did I say to you–

MS. NELSON: You told me–

MR. McKAY: –that you had a problem with?

MS. NELSON: I felt you had an attitude problem because you said, that’s why you was at home, you was his homebody while he was out [sleeping with] someone else. This is the exact words you said to me.

MR. McKAY: I didn’t.

MS. NELSON: Oh my God.

 * * *

MR. McKAY: Now what else did me or Mr. O’Connor say or do to you that you had a problem with?

MS. NELSON: No, it wasn’t that it was no problem. I’m just saying I didn’t like the attitude. Who wanted to get locked up?

MR. McKAY: You being locked up wasn’t our decision. There was a warrant out for you.

MS. HILL-McCLAIN: He’s testifying. I’ll object.

THE COURT: I’ll sustain the objection.”

Lastly, on recross examination, Nelson elaborated on her allegation that she had been detained in a “cage” at the police station:

“MS. HILL-McCLAIN: And were you by yourself in a cage?

MS. NELSON: Yes.

MS. HILL-McCLAIN: And you had the state’s attorneys and the police?

THE COURT: One question at a time. Let her answer the questions.

MR. O’CONNOR: May I enter an objection to counsel’s continuous misstatement of what occurred? There’s never been any interview in a cage.

THE COURT: Sustained.”

Before this court, the State has conceded the error of the prosecutors’ “testifying” objections. An objection is intended only to state the fact of the objection and the evidentiary basis therefore. See 
Eizerman v. Behn
, 9 Ill. App. 2d 263, 287 (1956). The objections quoted above constituted an improper attempt by the prosecutors to introduce contrary evidence through
 
themselves while Nelson was still on the witness stand. See also 
People v. Wielgos
, 220 Ill. App. 3d 812, 818 (1991) (State should not editorialize when stating an objection).

Moreover, the State’s objections violated the “advocate-witness rule,” which bars attorneys from assuming a dual role as advocate and witness in the same proceedings. See 134 Ill. 2d Rs. 3.3(a)(10); 3.7, 
United States v. Johnston
, 690 F.2d 638, 642 (7th Cir. 1982). The rule is particularly pertinent to prosecutors in criminal cases because of the sensitive role they assume as the government’s representative in the court room. In 
Johnston
, 690 F.2d 638, the Seventh Circuit Court of Appeals repeated four considerations that animate the witness-advocate rule: (1) as an advocate for the government, the prosecutor’s objectivity as a witness could never be assured; (2) the prosecutor’s credibility is automatically (and unfairly) enhanced by the prestige and authority of the prosecutor’s office; (3) the dual role of witness and advocate assumed by a prosecutor might confuse the jury; and (4) the rule reinforces the adage that the appearance of propriety is as vital to the operation of our judicial system as actual propriety. 
Johnston
, 690 F.2d at 643.

In the instant case, the prosecutors’ “objections” to Nelson’s testimony exceeded the accepted evidentiary bases for entering objections. Instead, they offered the jury a simultaneous rebuttal to Nelson’s account of an event where both McKay and O’Connor were present. Since the objections were made by prosecutors, moreover, the State gained an unfair advantage: it is probable that the jury endowed the remarks made by government representatives with greater credibility than is normally accredited to witnesses. See 
Johnston
, 690 F.2d at 643. The advantage gained by the State in this case was reinforced by the fact the trial court sustained some of the State’s objections, so that, in the eyes of the jury, the trial judge might have appeared to endorse those objections. Accordingly, counsel should have refrained from attempting to rebut Nelson’s testimony with their own “testimony.” Further, the trial court erred whenever it failed to overrule the editorial comments offered by McKay and O’Connor.

D. Cumulative Error

In response to each assertion of error by defendant, the State urges that, regardless of whether error occurred, the evidence against defendant at the guilt and sentencing phases was so overwhelming that the absence of these errors would have made no difference in the outcome of the trial. This court may invoke the harmless error doctrine to dispose of claims of error that have a 
de minimus
 impact on the outcome of the case. 
Kliner
, 185 Ill. 2d at 157; 
People v. Brown
, 172 Ill. 2d 1, 38 (1996).

Yet prejudice to a defendant’s case is not the sole concern that drives our analysis of defendant’s appeal: “A criminal defendant, whether guilty or innocent, is entitled to a fair, orderly, and impartial trial” conducted according to law. 
People v. Bull
, 185 Ill. 2d 179, 214 (1998). This due process right is guaranteed by the federal and state constitutions. 
Bull
, 185 Ill. 2d at 214; U.S. Const., amend. XIV, §1; Ill. Const. 1970, art. I, §2; see also 
Peeples
, 155 Ill. 2d at 480.

Additionally, when a defendant’s right to a fair trial has been denied, this court must take corrective action so that we may preserve the integrity of the judicial process. 
People v. Carlson
, 79 Ill. 2d 564, 577 (1980). To determine whether defendant’s right to a fair trial has been compromised, we employ the same test that this court uses whenever it applies the second prong of the plain error test. 134 Ill. 2d R. 615(a). We ask whether a substantial right has been affected to such a degree that we cannot confidently state that defendant’s trial was fundamentally fair. 134 Ill. 2d R. 615(a); 
People v. Keene
, 169 Ill. 2d 1, 17 (1995); 
People v. Terrell
, 185 Ill. 2d 467, 522-23 (1998) (Freeman, C.J., specially concurring).

As explained in 
People v. Green
, 74 Ill. 2d 444, 455 (1979) (Ryan, J., specially concurring), when an error arises at trial that is of such gravity that it threatens the very integrity of the judicial process, the court must act to correct the error, so that the fairness and the reputation of the process may be preserved and protected. Critically, the court will act on plain error 
regardless
 of the strength of the evidence of defendant’s guilt. 
Green
, 74 Ill. 2d at 455 (Ryan, J., specially concurring).

Justice Ryan noted in 
Green
:

“ ‘Even those guilty of the most heinous offenses are entitled to a fair trial. 
Whatever the degree of guilt
, those charged with a federal crime are entitled to be tried by the standards of guilt which [the legislature] has prescribed.’ ” (Emphasis in original.) 
People v. Green
, 74 Ill. 2d at 455 (Ryan, J., specially concurring), quoting 
Screws v. United States
, 325 U.S. 91, 107, 89 L. Ed. 1495, 1506, 65 S. Ct. 1031, 1038 (1945).

In this appeal, we hold that a new trial is necessary in order to preserve the trustworthiness and reputation of the judicial process. We do not disagree that the evidence proving defendant’s guilt is overwhelming. Nonetheless, regardless of the weight of the evidence, as guardians of constitutional rights and the integrity of the criminal justice system, we must order a new trial when, as here, we conclude that defendant did not receive a fair trial.

Each of the errors detailed above, in and of themselves, cast doubt upon the reliability of the judicial process. Cumulatively, we find that the errors created a pervasive pattern of unfair prejudice to defendant’s case. 
People v. Speight
, 153 Ill. 2d 365, 376 (1992); 
People v. Albanese
, 102 Ill. 2d 54, 83 (1984); 
People v. Whitlow
, 89 Ill. 2d 322, 341 (1982). The argument by State’s counsel concerning the Doffyn family and the police encouraged the jury to return a verdict grounded in emotion, and not a rational deliberation of the facts. Therefore, by allowing the State to suggest improper considerations to the jury, the trial court errantly allowed the jury to consider “evidence” not relevant to defendant’s alleged crimes.

 Combined with the introduction of the dead officer’s bloodied uniform, moreover, the errors assumed a synergistic effect. In particular, if we view together the manner and duration of the uniform’s display, the appeal to the jurors to demonstrate their gratitude to the police force, the introduction of Doffyn’s oath of office and testimony that his star occupies an honored place at police headquarters, we discern an intent by the State to place the jury’s responsibility as citizens on trial, as much as the State placed defendant on trial. See 
People v. Carter
, 297 Ill. App. 3d 1028, 1034-35 (1998).

The State’s overbearing conduct in pursuit of defendant’s convictions was further demonstrated by the assistant State’s Attorneys’ behavior at trial. The tendency of the prosecutors to interject editorializing objections unfairly negated evidence that may have been favorable to defendant. The fact the objections were made–and sometimes sustained–by government representatives suggested that, because knowledgeable authorities found the testimony in question incredible, then the jury should reach the same conclusion.

 Under these circumstances, defendant did not receive a fair trial. 
Bull
, 185 Ill. 2d at 214; 
Bernette
, 30 Ill. 2d at 371. In sum, the trial court allowed the guilty verdict to rest on considerations other than the evidence alone. Accordingly, we reverse defendant’s convictions and sentence and remand for a new trial.

 In light of our decision to reverse the judgment entered by the trial court, we need not decide the remainder of the alleged errors identified by defendant. However, we will address one remaining issue which the court finds troubling and which the court directs the parties and the trial court to remedy in the event of a retrial.

E. Conduct of Counsel

The record in the present matter yields evidence of improper conduct by both counsel for the State and for defendant. In addition to the impermissible objections made at trial by the State’s counsel, we have found the behavior of the attorneys in this case so wanting in professionalism that we believe it necessary to address the most egregious examples of that conduct here.

An assistant State’s Attorney engaged in improper conduct in his examination of Dr. Gelbort during the aggravation/mitigation phase. The source of the State’s animosity toward Gelbort was the State’s unsuccessful, pretrial attempts to obtain a copy of Gelbort’s report of his examination of defendant. Defendant argues that the State’s cross-examination of Gelbort was “very prejudicial” because the State insinuated that defendant’s attorneys hid the report from the State. Our review of the record reveals that even after Gelbort informed the prosecutor that he had turned his report over to the court, the State’s attorney questioned Gelbort’s veracity concerning the State’s attempts to meet with him. The tone and manner of the examination amounted to harassment, which was improper in and of itself. It was doubly improper, however, because if the State had difficulty obtaining discovery concerning anticipated expert testimony, the State’s remedy rested  with the trial court or defendant’s attorneys, and not with the witness himself.

The remaining complaints against the attorneys for the State include shouting at a defense witness in open court, throwing photographic exhibits onto a table in front of defense counsel, and calling one of defendant’s attorneys an “asshole” in the judge’s chambers. We agree that these incidents were improper. Attorneys should, at all times, maintain a sense of decorum and professionalism. Infantile behavior and foul language are signs of disrespect for the court and the justice system, as much as a lack of respect for each other. 
People v. Lyles
, 106 Ill. 2d 373, 413-14 (1985).

In fairness to the State, however, we note that counsel for defendant engaged in improper behavior as well. According to the State, defense counsel referred to one of the prosecuting attorneys as a “jerk.” One of defendant’s attorneys was argumentative with the court, had to be admonished not to make “speaking” objections of her own, and was twice reminded not to leave the courtroom while the trial was in session. Too, in the many instances of unnecessary bickering between the attorneys during trial, counsel for defense and the State displayed equal degrees of immaturity and unprofessionalism.

CONCLUSION

For the reasons stated above, we reverse the judgment of the trial court. We remand the cause for a new trial.

Reversed and remanded.