**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 180242-U

Order filed January 27, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0242 Circuit No. 17-CF-772 |
| DUSTIN M. AMERMAN, | ) ) ) | Honorable Kevin W. Lyons, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE SCHMIDT delivered the judgment of the court.
Presiding Justice McDade and Justice Holdridge concurred in the judgment.

**ORDER**

¶ 1      *Held*:  (1) The State proved defendant guilty of intentional homicide of an unborn child beyond a reasonable doubt, (2) the court did not abuse its discretion by allowing the State to use defendant's prior felony convictions for impeachment purposes, and (3) the cumulative effect of several other alleged errors did not deny defendant a fair trial.

¶ 2      Defendant, Dustin M. Amerman, appeals his convictions for intentional homicide of an unborn child, aggravated domestic battery, aggravated battery, and domestic battery. Defendant argues (1) the State failed to prove beyond a reasonable doubt that his actions caused or contributed to the child's death, (2) the court erred by failing to conduct a *Montgomery* balancing test before

allowing the State to impeach him with his prior felony convictions, and (3) cumulative error denied him a fair trial. We affirm.

¶ 3                                          I. BACKGROUND

¶ 4        The State charged defendant with intentional homicide of an unborn child (720 ILCS 5/9-1.2(a)(2) (West 2016)), aggravated domestic battery (*id.* § 12-3.3(a)), aggravated battery (*id.* § 12-3.05(d)(2)), and domestic battery (*id.* § 12-3.2(a)(2)).

¶ 5        On the evening of September 16, 2017, defendant argued with his girlfriend, Autumn Horton, who was pregnant. The argument escalated, and defendant body slammed Autumn to the ground twice and struck her repeatedly. On September 19, 2017, Autumn's grandmother, Cheryl Horton, took her to the hospital, where she gave birth to a stillborn child.

¶ 6        At trial, both defendant and Autumn testified that he neither body slammed nor struck Autumn. The State played a recording of a phone conversation between defendant and Autumn, in which Autumn repeatedly accused him of body slamming her. The State also called four witnesses whose testimony contradicted defendant's and Autumn's denials. Becca Simmons, Autumn's roommate, testified that she spoke with Autumn on September 17, 2017, and that Autumn told her that "[defendant] had hit [Autumn] multiple times and body slammed her twice[.]" Cheryl testified that on September 17, 2017, Autumn told her that "[defendant] beat [Autumn] up, hitting her multiple times and body slamming her twice[.]" Detective Seth Landwehr of the Peoria Police Department testified that he interviewed Autumn on September 19, 2017, and that she told him "[defendant] hit her approximately 18 times all over her body with a closed fist[.]" and "picked her up and body slammed her onto the floor two times[.]" Sarah Dooley, Autumn's probation officer, testified that she spoke with Autumn on September 22, 2017, and Autumn told her that a few days earlier "[defendant] lost it on her and punched her and kicked her[.]"

¶ 7    Additionally, the State called Officer Christina Chavez of the Peoria Police Department, who, in response to a question asking why she was dispatched to Autumn's location on September 17, 2017, testified, "I was informed that a female had been beaten up or assaulted by her boyfriend the night before."

¶ 8    The State tendered Dr. Kathryn Craig, a board-certified emergency medicine physician who has been licensed to practice in Illinois since 2000, as an expert in emergency care and treatment. Craig testified that she and her colleagues see patients with pregnancy-related issues almost daily. She delivered at least 7 full-term babies in the emergency room. She also treated approximately 100 patients who experienced spontaneous miscarriages and assisted in about 60 to 70 deliveries during her residency. Craig treated Autumn on September 19, 2017. Autumn was suffering from acute abdominal pain and told Craig's nurse that she had experienced domestic violence. Autumn had not felt the child move since the previous day. Craig performed an ultrasound and confirmed that there was no fetal heartbeat, nor was the unborn child moving. Craig observed the child after the delivery. Based on the child's appearance, Craig believed the child had been dead for more than a few hours.

¶ 9    When Autumn delivered the placenta, Craig observed a large blood clot on it, as well as regions of dead tissue. According to Craig, these symptoms were consistent with a placental abruption, which occurs when the placenta pulls away from the uterine lining. Craig testified that, based on the sequence of events, the physical trauma Autumn suffered from defendant body slamming her contributed to the placental abruption. The court overruled defendant's objection that Craig should not be permitted to testify to the cause of the placental abruption.

¶ 10    The State also tendered Dr. Matthew Fox, the forensic pathologist who performed the child's autopsy, as an expert in forensic pathology. Fox testified that the placental abruption caused

the child's death. According to Fox, the child died anywhere from eight hours to several days before the delivery. Three risk factors that increase the likelihood of a placental abruption were present in this case: (1) the child's low gestational weight, (2) cotinine found in the child's blood, indicating that Autumn smoked while pregnant, and (3) a physically traumatic event. According to Fox, a woman who was body slammed onto the floor would be at a heightened risk to suffer a placental abruption. Fox testified that if Autumn experienced a physically traumatic event on the evening of September 16, 2017, it would be consistent with the timeline of the child's death.

¶ 11　　　　After the defense rested, the State submitted defendant's felony convictions from two prior judicial proceedings as impeachment evidence. The court determined that defendant had been out of custody for less than 10 years after each conviction and admitted them over defendant's objection that they were more prejudicial than probative. The court read the convictions to the jury but did not permit them to go back during deliberations. The court also gave the following limiting instruction: "[E]vidence of a defendant's previous conviction of an offense may be considered by you only as it may affect his believability as a witness and must not be considered by your as evidence of his guilt of the offense with which he is charged."

¶ 12　　　　During closing arguments, the State repeatedly mentioned defendant's age, which was not included in the evidence presented at trial. Defense counsel informed the jury of a witness the State did not call to testify. In response, the State mentioned two witnesses that defendant did not call.

¶ 13　　　　The jury found defendant guilty of all charged offenses. The court sentenced defendant to 25 years' imprisonment for intentional homicide of an unborn child, and a concurrent 8 years' imprisonment for aggravated domestic battery. The aggravated battery and domestic battery charges merged with the aggravated domestic battery charge. Defendant appeals.

¶ 14　　　　　　　　　　　　　　　　II. ANALYSIS

- 4 -

¶ 15    Defendant argues (1) the State failed to prove beyond a reasonable doubt that he caused Autumn's placental abruption, (2) the court erred by failing to conduct a *Montgomery* balancing test before allowing the State to impeach him with his prior felony convictions, and (3) cumulative error denied him a fair trial. We address each of defendant's arguments in turn.

¶ 16                            A. Sufficiency of the Evidence

¶ 17    Defendant argues that the State failed to prove beyond a reasonable doubt that he caused the placental abruption that led to the child's death. "A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *People v. Collins*, 106 Ill. 2d 237, 261 (1985). It is not the reviewing court's role to retry the defendant. *Id.* Instead, we must ask whether, " 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The trier of fact must "resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts." *People v. Gray*, 2017 IL 120958, ¶ 35. The trier of fact need not "search out a series of potential explanations compatible with innocence, and elevate them to the status of a reasonable doubt." *People v. Russell*, 17 Ill. 2d 328, 331 (1959).

¶ 18    "A person commits the offense of intentional homicide of an unborn child if, in performing acts which cause the death of an unborn child, he *** knew that his acts created a strong probability of death or great bodily harm to the pregnant woman or her unborn child." 720 ILCS 5/9-1.2(a)(2) (West 2016).

¶ 19    Defendant argues that the State failed to establish that he caused the child's death. Fox testified that the child died from a placental abruption, that traumatic events increase the likelihood

of a placental abruption, and that a woman being body slammed to the ground qualifies as a traumatic event. Despite defendant's and Autumn's respective testimony that defendant neither body slammed nor struck her, three different witnesses testified that Autumn told them that defendant body slammed her to the ground twice, and a fourth witness testified that Autumn told her that defendant punched and kicked Autumn. The State also presented a phone call in which Autumn repeatedly accused defendant of body slamming her. Craig testified that the trauma from being body slammed contributed to Autumn's placental abruption. Both Fox and Craig testified that the sequence of events supported the conclusion that defendant body slamming Autumn contributed to the placental abruption, which caused the child's death.

¶ 20        Based on our review of the record, a rational trier of fact could have found that defendant knew that body slamming and striking Autumn repeatedly created a strong probability of great bodily harm to Autumn and her unborn child, and that his actions caused the unborn child's death, despite the presence of two additional placental abruption risk factors. The evidence presented was sufficient to prove defendant guilty of intentional homicide of an unborn child beyond a reasonable doubt.

¶ 21                    B. Prior Convictions as Impeachment Evidence

¶ 22        Defendant argues the court erred by failing to conduct a *Montgomery* balancing test before allowing the State to impeach him with his prior felony convictions. "The determination of whether a witness'[s] prior conviction is admissible for impeachment purposes is within the discretion of the trial court." *People v. Atkinson*, 186 Ill. 2d 450, 456 (1999). "An abuse of discretion will be found only where the trial court's ruling is arbitrary, fanciful, unreasonable, or where no reasonable person would take the view adopted by the trial court." *People v. Caffey*, 205 Ill. 2d 52, 89 (2001).

¶ 23          In *Montgomery*, our supreme court held that a witness's prior conviction is admissible for impeachment purposes "if the crime, (1) was punishable by death or imprisonment in excess of one year ***, or (2) involved dishonesty or false statement regardless of the punishment," unless the danger of unfair prejudice substantially outweighs the conviction's probative value. *People v. Montgomery*, 47 Ill. 2d 510, 516 (1971); see Ill. R. Evid. 609 (eff. Jan. 6, 2015). The *Montgomery* court also held that "[e]vidence of a conviction *** is not admissible if a period of more than 10 years has elapsed since the date of conviction or of the release of the witness from confinement, whichever is the later date." *Montgomery*, 47 Ill. 2d at 516.

¶ 24          The court did not abuse its discretion by admitting defendant's prior felony convictions as impeachment evidence, or by failing to verbalize explicitly its application of the *Montgomery* balancing test. See *People v. McGee*, 286 Ill. App. 3d 786, 792-93 (1997) ("It is enough that 'there is no reason to suppose that [the trial court] disregarded the familiar, well-established *Montgomery* standard in determining that the impeachment was proper.' " (quoting *People v. Williams*, 173 Ill. 2d 48, 83 (1996))). At trial, defense counsel objected to the convictions' admission into evidence, arguing they were more prejudicial than probative. From this we can reasonably infer that the court weighed the convictions' probative value as impeachment evidence against their prejudicial value, even though the court did not use this exact language in overruling the objection. See *People v. Groel*, 2012 IL App (3d) 090595, ¶ 43 ("A trial judge is presumed to know the law, and a reviewing court will ordinarily presume the trial judge followed the law unless the record indicates otherwise."). Further, the court gave a jury instruction aimed at limiting the convictions' potential for prejudicial impact, which clearly demonstrated the court's understanding of the applicable evidentiary rules. From our review of the record, the court properly admitted defendant's prior convictions into evidence for impeachment purposes.

C. Cumulative Error

¶ 26       Defendant argues that the cumulative impact of multiple errors made throughout the proceedings denied him a fair trial. "[W]here errors are not individually considered sufficiently egregious for an appellate court to grant the defendant a new trial, but the errors, nevertheless, create a pervasive pattern of unfair prejudice to the defendant's case, a new trial may be granted on the ground of cumulative error." *People v. Howell*, 358 Ill. App. 3d 512, 526 (2005). In determining whether defendant was denied a fair trial "we employ the same test that this court uses whenever it applies the second prong of the plain error test. [Citation.] We ask whether a substantial right has been affected to such a degree that we cannot confidently state that defendant's trial was fundamentally fair." *People v. Blue*, 189 Ill. 2d 99, 138 (2000). We apply *de novo* review to this question of law. *People v. Graham*, 206 Ill. 2d 465, 474 (2003).

¶ 27       Defendant lists four alleged errors: (1) inadmissible hearsay testimony from the responding officer, (2) improper opinion testimony from Dr. Craig, (3) cumulative testimony from the State's impeachment witnesses, and (4) prosecutorial misconduct during closing arguments. Defendant failed to preserve his hearsay, cumulative testimony, and prosecutorial misconduct claims by objecting at trial and including them in a posttrial motion. See *People v. Johnson*, 238 Ill. 2d 478, 484 (2010) ("When, as here, a defendant fails to object to an error at trial and include the error in a posttrial motion, he forfeits ordinary appellate review of that error."). Reviewing courts may consider unpreserved errors under the plain-error doctrine. *People v. Wade*, 131 Ill. 2d 370, 375 (1989). However, defendant does not request that we do so. Instead, defendant asserts his constitutionally protected right to a fair trial and argues that "several errors combined to create a 'pervasive pattern of unfair prejudice' " in the instant case. See *Blue*, 189 Ill. 2d at 138. Defendant fails to acknowledge the unpreserved nature of all but one of his error allegations, perhaps

believing the constitutional nature of a cumulative error argument is sufficient for us to address them. Even after the State's brief observed that defendant preserved only one of his error claims, defendant failed to address the issue in his reply brief. "We are aware of no authority—and defendant has cited no such authority—to support the contention that, by combining multiple unpreserved, forfeited errors, a defendant may transform his claim into one that is preserved or not forfeited." *People v. Darr*, 2018 IL App (3d) 150562, ¶ 46.

¶ 28 Defendant only mentions plain error in passing, saying that "[t]o determine whether a defendant's right to a fair trial has been denied, this Court 'employ[s] the same test that this [C]ourt uses whenever it applies the second prong of the plain error test' " See *Blue*, 189 Ill. 2d at 138. We cannot infer from this single oblique reference that defendant requests that we apply the plain error test to his unpreserved error allegations. Instead, we understand defendant's statement to mean that, if we were to address his unpreserved argument, we would use the second prong of the plain error test to determine whether he was denied a fair trial.

¶ 29 We find that defendant forfeited review of his hearsay, cumulative testimony, and prosecutorial misconduct claims by failing to object to them at trial or including them in a posttrial motion. We must honor defendant's forfeitures as he has not requested that we apply the plain error test to these claims. Defendant only preserved his claim that the court erred by allowing Dr. Craig to provide expert witness testimony regarding whether defendant's conduct contributed to the placental abruption, which we discuss below. We review this evidentiary claim for abuse of discretion. *Caffey*, 205 Ill. 2d at 89 ("Evidentiary rulings are within the sound discretion of the trial court and will not be reversed unless the trial court has abused that discretion.").

¶ 30 Defendant argues that the State failed to lay sufficient foundation establishing the reliability of Craig's conclusion that the trauma in question contributed to the placental abruption,

and therefore her conclusion should have been excluded. "Generally, the opinion testimony of an expert is admissible if the expert is qualified by knowledge, skill, experience, training, or education in a field that has 'at least a modicum of reliability' and the testimony would assist the jury in understanding the evidence." *Turner v. Williams*, 326 Ill. App. 3d 541, 552 (2001) (quoting *Wiegman v. Hitch-Inn Post of Libertyville, Inc.*, 308 Ill. App. 3d 789, 799 (1999)).

¶ 31 The court did not abuse its discretion by permitting Craig to testify to her opinion regarding whether defendant's conduct contributed to the placenta abruption. The State properly tendered Craig as an expert in emergency care and treatment. Craig testified to her professional experience with labor and delivery procedures—she frequently saw patients with pregnancy-related issues, and she had delivered at least 7 full-term babies, assisted in approximately 60 to 70 deliveries during her residency, and treated approximately 100 patients who experienced spontaneous miscarriages over the course of her career. She also testified to her firsthand observations when she treated Autumn, including her conclusion that defendant body slamming Autumn contributed to the placental abruption. After defendant objected to Craig's conclusion, the court overruled defendant's objection, finding that Craig's testimony was valuable and that the jury could decide how much weight to afford her conclusions. From our review of the record, the court did not err in doing so. We do not reach the second prong of the plain error analysis.

¶ 32                                    III. CONCLUSION

¶ 33 For the foregoing reasons, we affirm the judgment of the circuit court of Peoria County.

¶ 34 Affirmed.