NOTICE
Decision filed 10/10/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 230308-U

NO. 5-23-0308

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Wiliamson County. |
| | ) | |
| v. | ) | No. 19-CF-74 |
| | ) | |
| DEMETRIUS CRITTENDON, | ) | Honorable |
| | ) | Michelle M. Schafer, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1   *Held*: Where the jury was given inconsistent, contradictory, and erroneous instructions defining the elements requisite for a finding of guilty for first-degree murder, a new trial is required.

¶ 2   Following a jury trial, the defendant, Demetrius Crittendon, was convicted of first-degree murder in violation of section 9-1(a)(1) and (a)(2) of the Criminal Code of 2012 (Code) (720 ILCS 5/9-1(a)(1), (2) (West 2018)). Additionally, the jury found that during the offense of first-degree murder, the defendant personally discharged a firearm that proximately caused the death pursuant to section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections (730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2018)). The defendant was sentenced to 50 years of imprisonment, followed by 3 years of mandatory supervised release.

1

¶ 3    The defendant raises two issues on appeal. This court, however, finds that the issue regarding the jury instructions, where the trial court gave the jury conflicting instructions on first-degree murder, one of which omitted the mandatory considerations of justification and second-degree murder, to be dispositive. For the following reasons, on that basis, we reverse the defendant's conviction for first-degree murder and remand for a new trial.

¶ 4                                    I. BACKGROUND

¶ 5    The record on appeal reveals the following relevant facts. On February 4, 2019, the State charged the defendant with three counts of first-degree murder: knowing (count I), intentional (count II), and strong probability (count III), and proceeded to trial on all three counts. The defendant's jury trial commenced on October 3, 2022. At the outset of trial, the parties stipulated that the defendant fired the bullet that killed the victim, Cedric Marshall, using a Ruger .22-caliber long rifle and that the victim died as result of two gunshot wounds, one of which passed through his heart and lung.

¶ 6    After opening statements, the State called Williamson County Sheriff's Deputy Aaron Anderson who testified that he responded to the Red Zone in Marion, Illinois, just before 2 a.m. on February 3, 2019. Upon arrival, Deputy Anderson observed a crowd of people running around and the victim, Marshall, lying face-up in front of the bar's front door. Nearby, another man, Jerry Goldman, was pointing a gun down at the defendant, who was also on the ground. Deputy Anderson secured the gun and placed the defendant in handcuffs. The defendant had injuries to his face and told officers that he had been shot in the chest. As he was being handcuffed, he said, "I was defending myself." Deputy Anderson checked the defendant for gunshot wounds but did not find any. Five shell casings were found near the front door of the bar, but no other firearms were found.

¶ 7    Jerry Goldman then testified that he walked out of the Red Zone just before 2 a.m. and saw Marshall standing outside the front door. Marshall appeared to be unarmed and was talking to a couple of girls, and there was no commotion or threatening behavior occurring. Goldman did not see the defendant interacting with Marshall at any point. After a minute or two, the defendant, saying nothing, walked around a van in the parking lot, pulled up a rifle, and fired shots at Marshall from within five feet of him. Goldman heard three shots, punched the defendant, and grabbed the gun. Another witness, Kyle Walker, also stepped in to restrain the defendant. Goldman pointed the gun at the defendant as police arrived on the scene.

¶ 8    Kyle Walker testified that he also left the Red Zone just before 2 a.m. and saw Marshall, his childhood friend, standing near a bagel stand outside the front entrance of the bar. Marshall was talking to some friends, and Walker testified he thought "something was going on," so he began to walk over to Marshall. Walker then noticed the defendant about six to eight feet away, firing a gun at Marshall. Walker testified that the defendant was not speaking when he fired the gun twice, and he was the one who grabbed the gun and started fighting with the defendant. Prior to the shooting, Walker did not hear Marshall make any threats, did not see him holding a weapon, and did not observe any aggressive movements. Walker did not know if the defendant had been in an argument with Marshall before he came out of the bar.

¶ 9    Brandon Odle testified that he left the Red Zone at 2 a.m. and went across the parking lot to get a bagel from the bagel stand. He and his friends were standing about 10 to 15 feet outside the front door of the bar, and he became aware of two men having an argument nearby. The men had their voices raised and the argument lasted about 30 seconds. One of the men, whom Odle identified as the defendant, said, "Hey, come down to my car." The second person, Marshall, said, "No, I'm staying up front." The defendant then walked away towards his car. A few minutes later,

Odle walked to his own car and heard three gunshots. He then turned and saw some people beating up the defendant and taking a gun from him. Odle did not witness the shooting and did not see Marshall threaten anyone before the shooting.

¶ 10    Kari Scott testified that she left the Red Zone with her sisters around 2 a.m. and was also standing by the bagel stand at the time of the shooting. As she and her sisters were standing there, Scott heard someone yell, "Stop, don't," and then heard a "pop." She looked toward the front door and saw the defendant holding a rifle and moving toward the building. The defendant seemed "determined" and shot at Marshall. Scott believed there were four shots fired. Immediately prior to the shooting, Scott testified that she did not hear Marshall yell anything and did not see him holding a weapon or threatening anyone in any way. Though she was not paying "particular attention" to Marshall, nothing seemed out of the ordinary.

¶ 11    Ricky Jenkins testified that he left the Red Zone at 2 a.m. and went straight to his truck, which was parked facing the bar's front entrance. Jenkins did not specifically recall an argument as he was leaving but stated there was always "some ruckus" around closing time. Jenkins sat in the driver's seat of his truck while the person in his passenger seat had a conversation with someone outside. He happened to glance up and saw the defendant carrying a rifle and heading toward the front door. The defendant crossed out of Jenkins's view, and Jenkins heard three or four shots. Jenkins then saw somebody else holding the gun and the defendant being beaten up in the parking lot. Jenkins acknowledged he would not have heard any altercation leading up to the shooting, because he was not close enough to the scene and had music playing in his truck.

¶ 12    Next, Williamson County Sheriff's Deputy Karl Gusentine testified that he was called to the scene just after 2 a.m. He interviewed witnesses and then spoke to the defendant, who was in custody, a little after 8 a.m. Deputy Gusentine Mirandized the defendant, who agreed to speak with

4

the deputy. The defendant first told Deputy Gusentine he had been drinking Bud Light, vodka, and Hennessy before the shooting and was drunk at the time. He said he had an altercation with Marshall, left to get his gun from his car, and then returned and shot Marshall. The defendant expressed multiple times that he "fucked up" because he should have just left or locked himself in the car. He also told Deputy Gusentine several times that he felt threatened by Marshall. The State then rested, and the defendant presented evidence.

¶ 13 The defendant called Bertha Reed, who testified that she arrived at the Red Zone with the defendant and a few others just before 2 a.m. She said that she did not see the defendant carrying a weapon and was not aware if he had one with him that night. When they approached the crowd outside of the bar, Reed got an "eerie feeling." She said a couple of people were staring at her and the defendant, and she thought there was tension between the defendant and Marshall. She noticed that most of the people in the crowd were Marshall's friends or family, and a lot of them were carrying guns. Reed stated that she did not see the defendant approach Marshall at any point. After a few minutes, she and the defendant decided to leave and started walking back to her car. She testified that she observed some men following them and then saw that her car was blocked in. The men popped the trunks on their cars, and the girls with them—who were Marshall's cousins— started being aggressive towards her. She thought she was going to have to fight. She went to the passenger side of her car and lost sight of the defendant as he was going towards the driver's side. She saw a man run toward the defendant, and she was then scared for the defendant and herself. She did not see anything else but heard gunshots. Reed acknowledged she did not see the shooting and did not know who fired shots.

¶ 14 The defendant then testified. He stated that he went to the Red Zone that night with "BB" (Reed), "Net," and "Amber." They arrived around closing time, and he had a gun inside his jogging

5

pants. When they approached the bar, he had a confrontation with Marshall. He testified that the general mood around him was threatening, and he feared for his life because Marshall was talking about shooting him. He said he saw Marshall holding a gun. He left the argument when he saw the gun and began walking towards his car, with his own gun still on his hip. As he was walking away, there were men from Marshall's group following him and making threats. His car was blocked in and several people started surrounding him. He was afraid because he believed Marshall and the other men were dangerous. As he was walking towards the car, the defendant said he heard a gunshot. He turned around, pulled his gun out of his pants, and shot Marshall. He thought Marshall shot him, also. After Marshall was shot, people began to surround him and hit him. When the police arrived, he told officers that he thought he had been shot, too.

¶ 15    On cross-examination, the defendant testified that he had the gun with him the whole time. When asked if he told Lieutenant Gusentine that he left the scene and retrieved his gun, he stated, "I possibly did." He also testified that it was "possible" that he told the lieutenant that he went to the car, grabbed his gun, went back to the victim, and shot him. He testified that he had the gun "on [his] hip." He admitted the gun was a three-foot long rifle and that it was loaded. He stated he saw other people with guns that night, but he was not sure if he told the lieutenant that he saw other people with guns, that he saw people waving guns around, or that he was scared by it. When asked if he was drunk, the defendant said he had been drinking beer, vodka, and cognac and was "buzzed up." He admitted that he told the lieutenant several times that he should have just left but testified that he did not leave because they "couldn't get out." He also admitted that he told the lieutenant that someone else had threatened to shoot him, and he said, "not if I do it to you first." He was unaware if he told the lieutenant that someone fired a gunshot at him before he fired his

6

own gun, and he explained that it was due to him having a concussion. He admitted that, "A lot of things I can't even remember." The defense then rested.

¶ 16    In rebuttal, the State recalled Lieutenant Gusentine, who testified that the defendant never told him that he saw other people with guns at the bar and never said that someone shot at him before he fired his own gun. The defendant had told another officer that he thought he had been shot, but a doctor examined him and released him with a broken nose, a swollen eye, and no gunshot wounds.

¶ 17    At the close of evidence, the trial court held a jury instruction conference outside the presence of the jury. The State and the defendant both submitted proposed instructions. There were discrepancies in the proposed instructions from the parties, so the jury instruction conference was continued to the next morning. The State objected to the defendant's request to instruct the jury on second-degree murder. The trial court overruled the State's objection. The court then accepted the defendant's proposed instructions for the burdens of proof (Illinois Pattern Jury Instructions, Criminal, Nos. 2.01A and 2.03 (4th ed. 2000) (hereinafter IPI Criminal)), the definition of "reasonable belief," and the definition of "preponderance of the evidence" (IPI Criminal No. 4.18). The parties mutually agreed to give IPI Criminal No. 7.01, the definition of first-degree murder. The version of IPI Criminal No. 7.01 given to the jury stated: "A person commits the offense of first degree murder when he kills an individual without lawful justification if, in performing the acts which case the death, he knows that such acts will cause death to that individual." The parties then discussed their proposed issues instructions.

¶ 18    The State proposed IPI Criminal No. 7.02, which covers issues in first-degree murder when second-degree murder is not at issue. The defendant objected, arguing that the instruction covered only first-degree murder; the court stated that it found the instruction "accurate" and marked the

7

instruction as "given over objection." The State then remarked that, if the court was giving second-degree murder instructions, IPI Criminal No. 7.06 would be the more appropriate issues instruction. The court agreed to give the defendant's proposed issue instruction, IPI Criminal No. 7.06. The State renewed its objection to the jury being allowed to consider second-degree murder. During the initial jury instruction conference, defense counsel admitted that he inadvertently miscopied the first page of IPI Criminal No. 7.06, and the trial court continued the conference to the next day, allowing both parties time to resubmit the proper instructions. The issues instruction eventually given to the jury stated:

> "To sustain the charge of First Degree Murder, the State must prove the following propositions:
>
> First proposition, that the defendant, Demetrius D. Crittendon, performed the acts which caused the death of Cedric Marshall.
>
> And second proposition, that when the defendant, Demetrius D. Crittendon, did so, he knew that his acts would cause the death of Cedric Marshall.
>
> If you find from your consideration of all the evidence that each one of these propositions has been proved beyond a reasonable doubt, you should find the defendant guilty.
>
> If you find from your conclusion—consideration of all the evidence that any of these propositions has not been proved beyond a reasonable doubt, you should find the defendant not guilty.
>
> You may not consider whether the defendant is guilty of the lessor offense of Second Degree Murder until and unless you have first determined that the State has proved beyond a reasonable doubt each of the previously stated propositions.
>
> The defendant has the burden of proving by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lessor offense of Second Degree Murder instead of First Degree Murder.
>
> By this I mean, that you must be persuaded considering all of the evidence in this case that it is more probably true than not true that the following mitigating factor is present.

That the defendant at the time he performed the acts which caused the of, [*sic*] believed the circumstances to be such that they justify the deadly force he used but his belief that such circumstance existed was unreasonable.

If you find from your consideration of all the evidence that the defendant has proved by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lessor offense of Second Degree Murder instead of First Degree Murder, you should find the defendant guilty of Second Degree Murder.

If you find from your consideration of all the evidence that the defendant has not proved by a preponderance of the evidence that a mitigating factor is present so that he is guilty of the lessor offense of Second Degree Murder instead of First Degree Murder, you should find the defendant guilty of First Degree Murder."

This instruction did not include the required third proposition when the jury is to be instructed on self-defense, *i.e.*, that the defendant was not justified in using the force which he used. The court also agreed to give the defendant's proposed instructions defining the affirmative defense of self-defense (IPI Criminal No. 24-25.06), the mitigating factor of unreasonable belief in self-defense (Illinois Pattern Jury Instructions, Criminal, No. 7.05 (approved Jan. 30, 2015) (hereinafter IPI Criminal No. 7.05)), and the concluding instruction to be given for both first- and second-degree murder (IPI Criminal No. 26.01A).

¶ 19 The jury found the defendant guilty of three counts of first-degree murder. The trial court denied the defendant's motion for a new trial, which failed to raise any error regarding the jury instructions. The defendant was sentenced to 50 years' imprisonment, to be served at 100%, followed by 3 years mandatory supervised release. The defendant filed a timely appeal.

¶ 20                                    II. ANALYSIS

¶ 21 The defendant contends that the trial court erred by giving the jury conflicting instructions on first-degree murder, thus denying him a fair trial. The trial court gave IPI Criminal No. 7.02 over defendant's objection, which is the instruction to be given "only when the court is not also instructing on the lesser offense of second degree murder," and where the court is also instructing

9

the jury on second-degree murder, the combined issues instruction IPI Criminal No. 7.04 or 7.06 should be used. (Internal quotation marks omitted.) *People v. Peoples*, 2020 IL App (1st) 161735-U, ¶ 49.

¶ 22    The submitted issues instruction, IPI Criminal No. 7.02, omitted the requirements applicable to the situation here, where the jury is to be instructed on both first-degree murder and second-degree murder. The defendant alleged that the mitigating factor that applied was that he believed his use of force was justified but his belief was unreasonable

¶ 23    The jury was also given IPI Criminal No. 7.05, which defines a mitigating factor for the purposes of second-degree murder, and IPI Criminal No. 24-25.06 (use of force in defense of a person). Further, the definitional instruction, IPI Criminal No. 7.01, which was also given to the jury, included the element, "without lawful justification," required whenever, as here, an instruction is to be given on an affirmative defense contained in article 720. See IPI Criminal No. 7.01, Committee Note.

¶ 24    The State argues that the defendant forfeited this issue by failing to object to the error at trial and to raise the issue in a posttrial motion. The defendant concedes that trial counsel did not object to all of the allegedly conflicting jury instructions and failed to preserve the issue in a posttrial motion. The defendant asks this court, however, to consider the failure to object pursuant to Illinois Supreme Court Rule 451(c) (eff. Apr. 8, 2013), which provides that, for criminal jury instructions, "substantial defects are not waived by failure to make timely objections thereto if the interests of justice require." Rule 451(c) carves out a limited exception to the general rule to correct "grave errors" and errors in cases "so factually close that fundamental fairness requires that the jury be properly instructed." *People v. Hopp*, 209 Ill. 2d 1, 7 (2004).

¶ 25    Rule 451(c) applies only "[w]here there are such grave errors in instructions so as to affect that very important consideration, justice." *People v. Jenkins*, 69 Ill. 2d 61, 66 (1977). "Although the giving of jury instructions is generally reviewed for abuse of discretion, when the question is whether the jury instructions accurately conveyed to the jury the law applicable to the case, our review is *de novo*." *People v. Pierce*, 226 Ill. 2d 470, 475 (2007).

¶ 26    Fundamental fairness requires the trial court to give proper jury instructions on the elements of the offense to ensure a fair determination of the case, and the failure to do so constitutes plain error. *People v. Williams*, 181 Ill. 2d 297, 318 (1998). It is the trial court's burden to ensure the jury is given the essential instructions as to the elements of the crime charged, the presumption of innocence, and the question of burden of proof. *Id.* (citing *People v. Cadwallader*, 181 Ill. App. 3d 488, 501 (1989)). Where conflicting instructions are given, one of which is a correct statement of the law and the other is an incorrect statement of law, the error is not harmless and constitutes grave error. *People v. Haywood*, 82 Ill. 2d 540, 545 (1980); *Jenkins*, 69 Ill. 2d at 67.

¶ 27    While the defendant did not object to the jury instructions or raise the issue in a posttrial motion, Rule 451(c) allows this court to review this issue. Our supreme court has held that "where there are two separate issue instructions, one proper and the other erroneous, each inconsistent with the other, our Rule 451(c) is applicable." *Jenkins*, 69 Ill. 2d at 66-67. In such a case, prejudice to the defendant is presumed because of the importance of the right involved, "*regardless* of the strength of the evidence." (Emphasis in original.) *People v. Blue*, 189 Ill. 2d 99, 138 (2000). Thus, we will review the merits of the defendant's contentions.

¶ 28    The merits of the defendant's argument for a new trial based on an error in jury instructions must be considered with the applicable law relating to first-degree and second-degree murder. To sustain the defendant's conviction for first-degree murder, the State was required to prove that the

11

defendant killed Cedric Marshall by performing acts that were intended to kill, do great bodily harm, or create a strong possibility of death or great bodily harm, and, where the defendant was claiming self-defense, that the defendant committed those acts without lawful justification. 720 ILCS 5/9-1(a)(1), (2) (West 2018).

¶ 29    The defendant raised the affirmative defense of self-defense. Section 7-1 of the Code provides in relevant part: "A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of lawful force." *Id.* § 7-1(a). A person is justified in the use of force which is intended or likely to cause death or great bodily harm, however, only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony. *Id.* In order for the trier of fact to consider self-defense, the defendant must establish some evidence of each of the following elements: (1) unlawful force is threatened against a person, (2) the person threatened is not the aggressor, (3) the danger of harm was imminent, (4) the use of force was necessary, (5) the person threatened actually and subjectively believed a danger existed which required the use of the force applied, and (6) the beliefs of the person threatened were objectively reasonable. *People v. Gray*, 2017 IL 120958, ¶ 50. Once an affirmative defense is raised, the State has the burden of proving the defendant guilty beyond a reasonable doubt as to that issue together with all the other elements of the offense. *People v. Jeffries*, 164 Ill. 2d 104, 127 (1995).

¶ 30    If the State negates any element of self-defense, the self-defense claim fails. *Gray*, 2017 IL 120958, ¶ 50. The trier of fact may then consider whether the defendant is guilty of second-degree murder, *i.e.*, whether a mitigating circumstance existed. *People v. Spiller*, 2016 IL App (1st) 133389, ¶¶ 29-30. A defendant commits second-degree murder when he commits first-degree

12

murder and, at the time of the killing, one of the enumerated mitigating factors is present. 720 ILCS 5/9-2(a) (West 2018). Although the burden of proof remains with the State to prove beyond a reasonable doubt each element of first-degree murder and the absence of mitigating circumstances, it is the defendant's burden to prove a mitigating factor by a preponderance of the evidence. *Id.* § 9-2(c); *People v. Kelly*, 2023 IL App (1st) 211470-U, ¶ 77.

¶ 31      Here, the defendant asserted that the mitigating factor, sometimes referred to as "imperfect self-defense," applied. The mitigating factor of imperfect self-defense applies where, at the time of the murder, the defendant *unreasonably* believes that circumstances exist which justify the use of deadly force, *i.e.*, that sudden force is necessary to prevent imminent fear of great bodily harm to himself or another. 720 ILCS 5/9-2(a) (West 2018); *Jeffries*, 164 Ill. 2d at 113. When a defendant is found guilty of second-degree murder, the trier of fact has, in essence, concluded that the evidence that the defendant has offered was not sufficient to support his claim of self-defense, but there exists a mitigating factor (*i.e.*, the objectively unreasonable belief that he was acting in self-defense) sufficient to reduce the offense of first-degree murder to second-degree murder. *Jeffries*, 164 Ill. 2d at 129.

¶ 32      Turning now to the jury instructions given in the present case, we first note that the purpose of jury instructions is to provide the jurors with the correct legal principles that apply to the evidence, so that they may reach a correct verdict. *People v. Lovejoy*, 235 Ill. 2d 97, 150 (2009). When examining instructions in a case, no single instruction is to be viewed in isolation; rather, it must be viewed in the context of the entire charge. *People v. Housby*, 84 Ill. 2d 415, 433-34 (1981).

¶ 33      The trial court properly instructed the jury in regards to the definitional instruction of IPI Criminal No. 7.01, which included the "without lawful justification" language. Next, the trial court read aloud to the jury the propositions in IPI Criminal No. 7.02 prior to their deliberations. IPI

Criminal No. 7.02 should not have been given when self-defense was raised as an affirmative defense. Nonetheless, the trial court gave IPI Criminal No. 7.02, over objection, and then gave an incorrect version of IPI Criminal No. 7.06. The final copy of IPI Criminal No. 7.06, submitted by defense counsel, did not include the first page. Therefore, the trial court used IPI Criminal No. 7.02, which should not have been given in the first instance, as the first page of IPI Criminal No. 7.06. This combined version contained neither the introductory language of "[t]o sustain the charge of *either* first degree or second degree murder" (emphasis added) nor the required third proposition: "That the defendant was not justified in using the force which he used."

¶ 34    A similar jury instructions issue was addressed in *Jenkins*, 69 Ill. 2d 61, where the central issue at the defendant's trial for attempted murder was whether the level of force that the defendant used was justified. The trial court gave the jury two attempted murder issues instructions: one omitted any reference to the fact that the defendant must not have been justified in using the force he employed; and a second instruction, which correctly stated the law and included the necessary three elements, including that the defendant's use of force must not have been justified. *Id.* at 66.

¶ 35    The court in *Jenkins* noted that the court has the duty inform the jury as to the law, but where the instructions are contradictory, the jury cannot perform its constitutional function. *Id.* "It is well established that the giving of contradictory instructions on an essential element in the case is prejudicial error and is not cured by the fact that another instruction is correct." *Id.* The court acknowledged that, in some circumstances, an inaccurate instruction may be cured by other instructions to the jury; however, "when the instructions are in direct conflict with one another, one stating the law correctly and another erroneously," that is not so. *Id.* Contradictory instructions put the jury in the position of having to select the proper instruction, a function exclusively the province of the trial court. *Id.*

14

¶ 36　Similarly, in *People v. Ayers*, 331 Ill. App. 3d 742 (2002), the defendant was charged with murder and claimed that he acted in self-defense. *Id.* at 750. The jury instructions defining first-degree and second-degree murder included a definitional instruction, IPI Criminal 3d No. 7.01A, which lacked the "without lawful justification" language. *Id.* at 753. Further, one issues instruction, IPI Criminal 3d No. 7.02A (Supp. 1996), omitted that the State must prove the defendant was not justified in using the force employed, while another instruction, IPI Criminal 3d No. 7.06A, was also given which correctly stated the law. *Ayers*, 331 Ill. App. 3d at 751-52. The *Ayers* court reasoned that the giving of both issues instructions forced the jury to "choose between two contradictory instructions which related to a central issue in the case, self-defense." *Id.* at 750. Thus, the jury was presented with two self-contained, inherently contradictory and inconsistent issues instructions defining the elements requisite for a finding of guilty. *Id.* at 751. As a result, the court concluded that the failure to give the correct definitional instruction, coupled with the giving of contradictory and inconsistent issues instructions on first-degree and second-degree murder, deprived the defendant of a fair trial. *Id.* at 753.

¶ 37　A vital part of a trial is the trial court's reading of instructions to the jury at the close of arguments. *People v. James*, 255 Ill. App. 3d 516, 526 (1993). Our supreme court has held that a jury instruction error is plain error where it "creates a serious risk that the jurors incorrectly convicted the defendant because they did not understand the applicable law, so as to severely threaten the fairness of the trial." *Hopp*, 209 Ill. 2d at 8. A defendant, however, need not prove the error in the instruction misled the jury. See *People v. Herron*, 215 Ill. 2d 167, 193 (2005). While jury instructions should be considered as a whole and not in isolation, this proposition rests on the assumption that the jury instructions clearly and properly inform the jurors of the law. *People v. Alvine*, 173 Ill. 2d 273, 290 (1996). Inconsistent instructions inhibit the jury's ability to perform

15

its function because the jury has not been adequately apprised of the law to be applied. *Id.* When jurors are forced to choose between conflicting elements within the instructions, the instructions as a whole cannot be considered curative of the confusion. *Id.*

¶ 38     Our supreme court recently reiterated in *People v. Hartfield*, 2022 IL 126729, that when the jury instructions are contradictory, the jury cannot perform its constitutional function. *Id.* ¶ 58. The supreme court again emphasized that where two directly conflicting instructions are given on an essential element, one stating the law correctly and the other erroneously, there is an inability to determine which instruction the jury was following. *Id.* The supreme court emphasized that where the integrity of the judicial system itself is at issue, regardless of plain error or harmless error analysis, such an error is presumed to be prejudicial. *Id.*

¶ 39     The error here is exactly such an instance. The trial court gave the definitional instruction for first-degree murder, including the "without lawful justification" language, but then an issues instruction that omitted the third proposition, stating "[t]hat the defendant was not justified in using the force which he used." Additionally, the "combination" of IPI Criminal No. 7.02 and IPI Criminal No. 7.06 was contradictory within itself, where IPI Criminal No. 7.06 should be the only issues instruction given in this case. Not only were the jury instructions here contradictory, they were also wrong. We find our recent decision in *People v. Oats*, 2024 IL App (5th) 190154-U, to be persuasive. There, we remanded the defendant's case for a new trial where the jury was given conflicting jury instructions on first-degree murder under strikingly similar facts. The State's arguments regarding forfeiture and invited error are unavailing in this case. Finally, the contention that the State's closing argument cured any possible prejudice to the defendant is completely meritless.

16

¶ 40    We note that, "for an accused to be convicted of a criminal offense, the jury must find that each element of the offense has been proven beyond a reasonable doubt." *James*, 255 Ill. App. 3d at 528. As guardians of constitutional rights and the integrity of the criminal justice system, we must order a new trial when we conclude that the defendant did not receive a fair trial. Where we cannot determine which instructions the jury was following when it convicted the defendant of first-degree murder, we must reverse his conviction and remand for a new trial. Thus, we need not address the defendant's other contentions of error on appeal.

¶ 41    After thoroughly reviewing the evidence, we are convinced that the evidence was sufficient to support a finding that the defendant is guilty beyond a reasonable doubt. Under these circumstances, a retrial of the defendant would not violate double jeopardy principles. *People v. Stafford*, 325 Ill. App. 3d 1069, 1075 (2001).

¶ 42                                III. CONCLUSION

¶ 43    For the foregoing reasons, we reverse the defendant's convictions and remand for a new trial.


¶ 44    Reversed and remanded.